## IN RE DISBARMENT PROCEEDINGS IN THE CASE OF FRANK M. McDERMIT.

### Argued March 31, 1899—Decided June 20, 1899.

1. The relation of counsel and client is one of the highest trust and confidence, and the counsel is under a duty to observe the strictest integrity in his dealings with his client and a just regard for his interest.
2. A counselor who is unfaithful to the instructions of his clients, who obtains from them money for which he fails and neglects to render any adequate service, and who retains for his own use money which he receives from them for another purpose, should be disbarred.

On rule to show cause.

Before Justices VAN SYCKEL, LIPPINCOTT and GUMMERE

For the prosecution, *Edward D. Duffield* and *Samuel H Grey*, attorney-general.

For the respondent, *Chauncey G. Parker* and *Chauncy H. Beasley*.

The opinion of the court was delivered by

VAN SYCKEL, J. In January last past a rule to show cause was granted by this court, requiring Frank M. McDermit, an attorney and counselor of this court, to show cause why he should not be disbarred or be suspended from the practice of his profession, because of his unprofessional conduct in certain respects set forth in said rule.

In the disposition of this rule we deem it necessary to consider only the "Dowd" case.

Evidence, very voluminous, was taken under this rule by both parties, and on the argument of the case the prosecution asked leave to amend the specifications in respect to the "Dowd" case in certain particulars set forth in a notice previously served upon the respondent.

The court has deemed it proper to allow and has allowed the proposed amendment to be made, because very full evidence, detailing all the facts and circumstances connected with the transaction, has been adduced on both sides, and it is clear that no injustice will be done by the amendment.

This charge, as amended, is that the said McDermit, having been applied to by one Jane Dowd to defend her son, Patrick Dowd, then charged in a certain proceeding in bastardy with having gotten one Minnie Hyland with child, the said McDermit agreed to act as counsel for said Patrick Dowd in said bastardy proceedings for the sum of $265, and as such counsel to render him such professional aid and assistance as it was the duty of him, the said McDermit, to do, which said sum of money was paid to the said McDermit by the said Jane Dowd, but that the said McDermit, disregarding his duty as an attorney and counselor of the Supreme Court of New Jersey, wholly neglected to defend the said Patrick Dowd upon the charge aforesaid; and further, that said McDermit, having already received from Jane Dowd the sum of $265 as a fee and compensation for his professional services as counsel for one Patrick Dowd, then charged with the crime of seduction, unlawfully and fraudulently demanded and received from Annie Dowd the further sum of $300,

under the color and pretence that said last-mentioned sum was necessary to be used and expended by him, the said McDermit, to procure bail for said Patrick Dowd upon the charge aforesaid ; whereas, in truth and in fact, the said sum of money last mentioned was not necessary to be used for the purpose aforesaid, and was not so used, but was fraudulently applied by said McDermit to his own use.

And further that, having been employed by the said Jane Dowd as aforesaid, and having agreed to act as her counsel aforesaid, the said McDermit did obtain from her, the said Jane Dowd, the sum of $200 or some other sum, under color and pretence that a suit for a breach of promise of marriage was about to be brought by the said Minnie Hyland against the said Patrick Dowd, and demanded from her the said sum of money for his services as counsel therein and for the necessary disbursements attending said suit; whereas, in fact, no such suit was ever begun and no services were ever rendered or disbursements made by the said McDermit in connection therewith, and thereupon it became the duty of said McDermit to repay the said last-mentioned sum of money to the said Jane Dowd, which he has wrongfully and fraudulently refused to do.

It needs no citation of authorities to establish the jurisdiction and power of this court to disbar an attorney for malpractice, nor is it necessary that the offence imputed to him should be of such a character as would subject him to criminal prosecution.

The relation of counsel and client is one of the highest confidence and trust, and the counsel is under a duty to observe the strictest integrity in his dealings with his client and a just regard for his interest.

If unfaithful and dishonest in the discharge of that duty he is false not only to the client but likewise to the court from which he derives the right to exercise his profession. The license is granted to him upon the implied understanding that he will be true to the suitor who engages his services and that he will abstain from such practices as cannot

fail to bring discredit upon himself and the profession of which he is a member.

Mr. Justice Field, in *Randall* v. *Brigham,* 7 *Wall.* 540, clearly states the rule to be applied to this proceeding and the manner in which it is to be conducted, as follows : " The authority of the court over its attorneys and counselors is of the highest importance. They constitute a profession essential to society. Their aid is required not merely to represent suitors before the courts but in the more difficult transactions of private life. The highest interests are placed in their hands and confided to their management. The confidence which they receive and the responsibilities which they are obliged to assume demand not only ability of a high order but the strictest integrity. The authority which the courts hold over them and the qualifications required for their admission are intended to secure these qualities."

And again he says : " It is not necessary that proceedings against attorneys for malpractice or any unprofessional conduct should be founded upon formal allegations against them. Such proceedings are often instituted upon information developed in the progress of a cause or from what the court learns of the conduct of the attorney from its own observation. Sometimes they are moved by third parties upon affidavit and sometimes they are taken by the court upon its own motion. All that is requisite to their validity is that, when not taken for matters occurring in open court, in the presence of the judges, notice should be given to the attorney of the charges made and opportunity afforded him for explanation and defence. The manner in which the proceeding shall be conducted, so that it be without oppression or unfairness, is a matter of judicial regulation."

After the witnesses on the part of the prosecution had been examined upon due notice (in the presence of McDermit and his counsel), giving their version of the transactions in which unprofessional conduct is imputed to McDermit, he examined his witnesses and gave his own testimony in his effort to exculpate himself. The conduct of McDermit in

his relation of counsel in the Dowd case and in the other cases is therefore before the court as fully, presumably, as it can ·be presented by evidence, and he has had full opportunity to disprove and explain any act testified to which shows that he was recreant to his duty to his clients.

In the evidence of McDermit himself, taken on his own behalf under this rule, the following facts, in relation to the "Dowd case," appear:

1. Patrick Dowd was charged by Minnie Hyland with being the father of her bastard child.

. 2. He had employed Michael Barrett to defend him, and Michael Barrett had advised him to plead guilty.

3. Jane Dowd, the mother of Patrick, in September, 1897, saw McDermit and told him that she was dissatisfied with Barrett, because he had advised Patrick to plead guilty, and she wished McDermit to defend him.

4. He accepted her retainer, and, after looking into the case, told her she would be wise to follow Barrett's advice.

5. On the 14th of September, 1897, Mrs. Dowd wrote a letter to McDermit, saying that Miss Hyland was a prostitute, and denying that her son was the father of the child, and declined to permit her son to plead guilty.

6. A day or two afterwards McDermit saw Mrs. Dowd, and informed her that Miss Hyland was about to institute a suit for breach of promise, and it seemed as if there would be quite a fight to save Patrick from the charges.

7. No breach of promise suit had then been commenced, and it was not commenced afterwards. All that was done in that respect by Miss Hyland's counsel was to present some affidavits to a Supreme Court commissioner to obtain an order to hold to bail, which was not successful.

8. No arrest had at that time been made on the charge of seduction, and before that arrest had been made Mrs. Dowd paid to McDermit $15 at one time, and afterwards the sum of $250, to defend the bastardy case and the threatened breach of promise suit.

9. While the bastardy proceedings were pending, the arrest

for seduction was made on September 18th, 1897, and there- upon Patrick was bailed by one Cummings, a friend of the Dowds.

10. On the 26th of September, 1897, Patrick was again arrested on a warrant issued in the seduction case by Justice Bosset, and then Mrs. Dowd and her daughter Annie called on McDermit.

11. On the 27th of September, 1897, McDermit procured bail for Patrick, to secure which he alleges he paid the sum of $100.

12. Annie Dowd had some money in the building and loan association in Newark, and on the 1st of October, 1897, McDermit went with her there, and at his instance she drew. from said association $300, and paid it to McDermit as a retaining fee and for services to be rendered in the seduction case.

13. On the 16th of October, 1897, he obtained from Annie Dowd the further sum of $325, which he told her was for security on the bastardy bond, and he requested her to call on him in a few days and he would give her and her mother vouchers for their payments to him.

These receipts are produced and read as follows:

"NEWARK, N. J., Oct. 20th, 1897.

*"Miss Annie Dowd to Frank M. McDermit, Dr.*

"To services, retaining fee and disbursements in case of State *v.* Patrick Dowd, City *v.* Patrick Dowd, in full, $565.

"Rec'd payment,

"FRANK M. McDERMIT."

"Oct. 20th, 1897.

"On deposit to secure bond, the sum of three hundred and eighteen 50-100 dollars. This money to be returned at the conclusion of the case, and this money not to be used for any other purpose except with the consent of Miss Annie Dowd.

"FRANK M. McDERMIT."

14. The bastardy case was tried. McDermit attended and cross-examined Miss Hyland, but offered no testimony on behalf of Patrick Dowd.

Patrick was convicted, and McDermit took an appeal.

15. At the hearing in the bastardy case Mrs. Dowd was present, and she said to McDermit that she would spend every dollar she could lay her hands on to prevent her son from marrying Miss Hyland.

16. While the appeal in the bastardy case was pending, Patrick was indicted by the grand jury of Essex county for seduction under what is known as the Hendrickson act, at December Term, 1897, and bail was furnished through McDermit.

17. When that indictment was moved for trial on the 10th of February, 1898, McDermit, in the absence of Mrs. Dowd and Miss Dowd, and without any previous consultation with either of them, and without giving them any notice of the trial, and without their knowledge or consent, advised Patrick Dowd to plead *non vult*, and to marry Miss Hyland, which, under that advice he at once did, without consulting either his mother or sister.

18. On the 3d of March, 1898, Mrs. Dowd waited on McDermit and told him that her son had married a prostitute, and he, McDermit, ought to be ashamed of himself; that she had paid him $265 to defend her son, and her daughter had paid him $300. She further charged him with stealing her boy and taking her money, and performing *no services for it*, and demanded the return of all the money which had been paid to him except $15.

He insisted upon keeping and did keep all the money which had been paid to him except the $325, which he says was given to him to secure bail for Patrick, and that, he admits, he did not return until after the Dowds made complaint against him before the Essex county grand jury.

This statement of facts, thus far, is contained in the testimony of McDermit.

By other testimony in the case it appears that the Dowds

are poor, illiterate people. They are of a class which readily bestows confidence upon one chosen as an adviser, and they especially need the arm of the court and the sanctions of the law to protect them from being imposed upon by the corrupt practices of unscrupulous men.

All the money paid to McDermit, except $65, was drawn from the fund which Annie Dowd, by her industry, had accumulated in the building and loan association, and all her earnings were exhausted by these payments.

The uncontradicted facts are that Mrs. Dowd, after employing Barrett, desired to secure another attorney because Barrett had advised her son to plead guilty. She so expressly informed McDermit, and told him that she would not consent to a plea of guilty, and that she would spend every dollar she could raise to prevent her son from marrying Miss Hyland.

Under such instructions, McDermit had $265 paid to him by Mrs. Dowd, and he afterwards received from Annie Dowd $625, which he says was on account of the seduction case.

He was in the employment of the mother and daughter; he was their paid counselor; he knew how they had exhausted their store of hard-earned savings to prevent the son from making what the mother had declared and believed to be a disreputable marriage. That was manifestly her cherished purpose and object in retaining McDermit, and he was given most emphatically to understand it. He was, therefore, under obligation to be governed by her instructions.

Yet, after he had engaged in the service of these clients, and had received what to them was a very large sum of money, he made no substantial defence to the bastardy suit, and not only permitted the indictment for seduction to go to trial without giving notice thereof either to Mrs. Dowd or her daughter, and without, so far as appears, making any preparation to defend the son, but also without the knowledge, permission or consent of either mother or daughter, advised the son to plead *non vult*, and to marry the girl who had prosecuted him.

His statement that he found that he could not successfully

defend the son, and that, therefore, he advised the plea of guilty, and the marriage, does not excuse his conduct.

With a just conception of the duty of a counselor of this court, and a due regard for that duty, he would have given notice to his clients of the hearing of the case, and would have been governed by their instructions, or he would have withdrawn from the case and would have returned to them the fees he had received, at least so far as he had not earned them by previous service.

He was clearly false to his duty to the mother and daughter; he violated the instructions he had received with his fees; he performed no service commensurate with the compensation he had received, and insisted upon retaining it.

There can be no justification for such conduct, and it must be admitted that the bitter attack made by Mrs. Dowd upon McDermit, after she had been apprised of his action, was not without justification.

The evidence thus far presented is very persuasive to show that he was actuated by selfish and mercenary motives, and without that regard for the interest of his clients which marks the conduct of honorable practitioners.

We do not, however, accept the testimony of McDermit as a truthful recital of the facts of the case. They are far more damaging than he would admit.

We cannot credit his statement that he advised Mrs. Dowd that it would be wise to let her son plead guilty and marry the girl. We entertain no doubt that, for the purpose of procuring from the Dowds all the money they were able to pay him, he encouraged them to make resistance to the prosecution of the son, and that he led them to believe that he would succeed in preventing the son from making a marriage so objectionable to the mother and daughter. Otherwise they could not have been induced to submit to the personal loss and sacrifice which the payment of so much money to McDermit involved.

We find, also, from the evidence that the sum of $265 paid by Mrs. Dowd to McDermit was for his services in the seduc-

tion case as well as in the bastardy case and in the breach of promise suit, as Mrs. Dowd testifies.

McDermit testifies that when Mrs. Dowd first saw him she paid him $15 to examine into the facts of the bastardy case; that on the 18th of September, 1897, she paid him the sum, of $50 and on the 20th of September she paid him $200, and that these payments were for the bastardy case and the breach of promise case only.

Justice Bosset testifies, and his docket shows, that the warrant for seduction was issued September 16th, 1897, and returned served September 18th, 1897. On the 18th of September he was bailed by James Cummings, and Tuesday, September 21st, 1897, was the day appointed for his examination under the charge.

Bosset testifies that McDermit, on the 18th of September, knew that Patrick Dowd had been arrested on the warrant for seduction, and that McDermit told him Cummings would be bail for Patrick.

Bosset further testifies that McDermit was present on Tuesday, September 21st, 1897, the day on which the seduction case was set down for hearing, and that it was postponed for two or three days at the request of McDermit.

Bosset further testifies that he (Bosset) was the first one who suggested the breach of promise suit to Miss Hyland, and that he made the suggestion on the 18th of September, and that on the 22d of September, 1897, he told McDermit that Miss Hyland intended to bring that suit.

Mrs. Dowd also testifies that she knew on Saturday, September 18th, that her son was arrested for seduction.

It therefore clearly appears that when Mrs. Dowd paid the $50 and the $200 to McDermit both she and McDermit knew that Patrick had been arrested on the seduction charge, and if the $200 was paid on the 20th of September, as McDermit testifies, neither of them knew that a breach of promise suit was threatened.

But if McDermit then knew of the threat to start the breach of promise suit, it is not to be credited that he would

have asked Mrs. Dowd to give him a fee in the breach of promise suit without asking a retainer in the seduction case, in which Patrick had been arrested and given bail and in which he had already rendered some service by suggesting to Justice Bosset that Cummings would become bail and by requesting an adjournment from the 21st of September to a later day in the week. Nor can it be believed that Mrs. Dowd would have retained McDermit in a suit not yet brought without engaging his services in the seduction case, which required immediate attention. Mrs. Dowd is corroborated and McDermit is discredited by the receipt he gave to Annie for $565, in which he states that the money was paid for the cases of the State *v.* Patrick Dowd and the City *v.* Patrick Dowd, and does not mention the breach of promise suit. The truth unquestionably is that the litigation commenced, and that threatened by the Hyland girl was prosecuted to compel Patrick to marry her; it was all directed to that one end, and to prevent the accomplishment of that purpose on her part, the mother retained McDermit. McDermit was so expressly advised, and he was under obligation, after accepting her retainer, to defend the Dowds against all the movements which were made to coerce a marriage.

After McDermit had received the $265 from Mrs. Dowd, which placed him under a duty to defend the bastardy suit and the seduction suit, his dealings with Annie Dowd commenced. He had ascertained that Annie had money in the building and loan association. She testifies that McDermit sent for her after Patrick was arrested a second time on the seduction charge, on the 26th of September, 1897. She says she went to his office on the 1st of October, 1897, and he told her he would have to have the money she had in the building and loan association for Patrick's bail, and he went there with her, and she drew $300 and gave it to him for that purpose, but he did not, at that time, give her a receipt for the money. A day or two after that he sent for her again, and she went to his office and he told her he would have to have the rest of her money; that the city compelled him to

put up $1,400 for bail, and it would be all right for her, and that when the suit was ended she would get it all back. She says McDermit had a paper drawn, authorizing the building and loan association to pay him the further sum of $325, which was all the money she had left, and that she signed the paper and he drew the money, and that the whole of the $625 was paid to McDermit by her on account of bail.

McDermit, as before stated, says that the $300 first paid to him by Annie was for his fee in the seduction case and the last payment of $325 only was for bail.

The circumstances of the case lead us to accept the statements of Annie Dowd and to reject the evidence of McDermit in regard to this transaction.

He had received from Mrs. Dowd the sum of $265, which was a liberal compensation for persons in their situation to pay.

It is admitted that when Annie Dowd, on the 1st of October, 1897, paid him the $300, there had been no trial in the bastardy case—that was not tried until November 15th, 1897; that all that had been done in the seduction case was the issuing of the warrant by the justice and the arrest of Patrick, and that the breach of promise suit had not been brought. McDermit had not, at that time, rendered any service to the Dowds at all commensurate with the fee he had previously received. He could not in the just treatment of these clients ask Annie Dowd to pay him a further fee of $300, and it is not reasonable to believe that she would have acceded to such a request if he had made it.

Patrick Dowd was arrested, however, on a complaint in the seduction case, and to liberate him from confinement it was necessary to procure bail. While it is highly improbable that Annie, who knew how much her mother had paid to McDermit, would have paid to McDermit an additional fee of $300 at that time, it is reasonable to believe that she was willing to advance money to secure bail on the assurance given to her by McDermit. We are satisfied that the $625 was paid by Annie to McDermit on account of bail, and for

no other purpose, under the assurance that it would be returned to her at the termination of the suit.

The testimony of Lowy is too indistinct and uncertain to be of any probative force to corroborate McDermit.

Nor do the receipts which he gave to Annie lend any support to his version of the affair. He did not give her any receipt at the time he procured the money from her, but told her to come to his office afterwards, and he would give her and her mother vouchers for their payments to him. Annie went to his office, and he gave her the two receipts hereinbefore set forth, and told her to put them in her pocketbook and not to show them to anybody. She further testifies that she cannot read writing, and did not know what was in the receipts. McDermit had promised to give her and her mother vouchers for their payments to him, and it was reasonable that she should suppose that one of these receipts was to the mother for the $265, and the other to herself for the $625. Neither was a receipt to the mother; both were receipts to Annie, the one reading as if she, and not her mother, had paid the $265.

We are convinced that this was an adroit scheme on the part of McDermit to make it appear that Annie had given him $300 as a fee. His claim to retain it, and his refusal to return it, was a fraud upon her.

The practice of obtaining money from clients for the purpose of procuring bail should be regarded with much disfavor by the courts. It gives an unfaithful attorney the opportunity to hold on to the money, as was done in this case, under a claim that it was paid to him for his services.

While it is not necessary to discuss the evidence taken in regard to the other charges under the rule to show cause in this case, the facts in the Brown case will be briefly set forth to show the manner in which McDermit conducts his business as an attorney.

Frank R. Brown, a young man, about twenty-one years of age, was anxious to obtain a divorce from his wife, and retained McDermit as his counsel.

McDermit says Brown called on him on the 6th of March, 1898, and consulted with him and gave him $50, " as a sort of contingent retainer in the case." He says he told Brown that he could not guarantee him a divorce, but if he would pay him $500, he would do the best he could to get evidence on which to file a bill for divorce.

On the 7th of March, 1898, Brown called again and paid McDermit $500, for which he gave him the following receipt:

" $550. NEWARK, N. J., March 7th, 1898.

" Rec'd from Frank R. Brown, the sum of five hundred and fifty dollars, as for retainer and counsel fee, and I agree to bring proceedings for divorce against his wife and pay all court fee and all other costs incident to such procedure—This to be in full payment also of all my services—

" FRANK M. McDERMIT, *Atty.*"

On the 11th of April, 1898, Brown was arrested on the complaint of the overseer of the poor for the desertion of his wife. The bail was fixed at $500, McDermit himself becoming surety on the bond. At the time this bond was given, $300 was paid by Brown to McDermit to secure him from loss, which sum was to be returned to Brown at the conclusion of the desertion case, if Brown was acquitted, otherwise to remain in McDermit's possession, subject to the order of the court.

The case was tried May 11th, 1898, and Brown was found not guilty, the trial occupying about four hours.

On the 12th of May, 1898, Brown called at McDermit's office, and signed the following paper which was drawn by McDermit:

" NEWARK, N. J., May 12th, 1898.

" In addition to fee of $550 paid to Mr. McDermit as his retainer and for services rendered by him for me, I agree, in addition to pay him the $300 now held by him—[then there is a dash] as security for his bail bond for his services ren-

dered by him in the case of the City *v.* Brown—[then there is another dash] upon which case I have been acquitted—[then there is another dash]. The payment of the said $850 to McDermit is to include any and all fees for services that he may be called upon to perform in the Court of Chancery, or elsewhere in my behalf—[then there is another dash] and said payments are voluntary, and I have no future interest or right to the said $850—[then there is another dash] said money to be McDermit's sole property.

"FRANK R. BROWN.
"Witnessed by WALTER H. BAKER."

McDermit says he drew this paper in view of the fact that he had been complained against in the Dowd case; that he read it to Brown and Baker before it was signed and witnessed, and that he also offered to pay Brown the $300, and that he laid on the table three one-hundred-dollar bills, which Brown refused to take. Brown also testifies to the like effect.

Yet, notwithstanding the fact that McDermit could not induce Brown to accept a return of the $300, and notwithstanding this paper signed by Brown on the 12th of May, 1898, Brown early in June, 1898, went to the office of the "Sunday Call," a newspaper published in the city of Newark, and complained that McDermit had done nothing to procure him a divorce, and that he refused to pay back the $300 deposited with him. Under the head of "Accused by a Client," the "Sunday Call" published these charges.

Robert H. McCarter, Esq., president of the Lawyers' Club of Essex county, whose word no one will question, testifies that Brown gave him a copy of the article published in the "Sunday Call," and requested the club to take the matter up, saying that the article in the newspaper was true, but was not strong enough.

Brown also served on McDermit the following notice:

"FRANK M. McDERMIT—On March 7 last I paid you $550 to obtain a divorce for me. As you have taken no steps

to obtain such divorce, I hereby notify you to do nothing in that matter, and I hereby demand that you return to me at once the $550 which I paid you.

"Dated June eighteenth, 1898.

"FRANK R. BROWN."

Four days after this notice was served by Brown on McDermit, he wrote a letter of apology to McDermit, requesting McDermit to continue to act as his counsel.

On the 25th of June, 1898, Brown wrote again to McDermit, saying: "I desire to state emphatically that your conduct has been all right, and that the statements in the 'Sunday Call,' as far as they relate to you, were untrue, and I make no claim for any money against you."

And again he wrote a letter to McDermit on the 26th of June, 1898, denying that he had anything to do with the publication in the "Sunday Call."

To complete this account of the unsuccessful attempt of McDermit to prevail upon Brown to accept $300, which it is agreed belonged to Brown, and of the way in which Brown overcame the scruples which McDermit had about retaining it, it is necessary to refer to further testimony given by themselves.

McDermit says: "I told Brown to come to my office the next day and get the $300; he came and I offered him the money; he said no, he didn't want the money; he wanted me to go on with the divorce proceedings; * * * I said I didn't want the money; I didn't care to take it; he said, 'You had better take the money and go on with the case; you may have some more trouble; I understand you may have some alimony, perhaps, to pay in connection with this divorce case;' we talked for some time, and I told him if I was to take that money it would have to be in writing and the agreement would have to be specific."

Brown testifies that he told McDermit to hold the $300 for alimony if it was required, and if no alimony was ordered McDermit was to keep it. Then McDermit says he drew the

written agreement before recited, signed by Brown and witnessed by Baker, in which it is set forth that the $300, as well as the $550, was to be held by McDermit for his fees and services; that Brown was to have no future interest or right to the said $850, but that it was to be McDermit's sole property.

Their statement is that after Brown had for a time unsuccessfully urged McDermit to accept for his own use the $300, and after he had finally succeeded in overcoming his unwillingness to do so by suggesting that McDermit should hold it and pay out of it any alimony that might be allowed in the divorce case, McDermit at once drew this agreement, which declares that this money is to be the sole property of McDermit; that Brown is to have no interest in it, and omitting altogether any reference to the alimony. It cannot reasonably be supposed that such a statement would be accepted as a defence to these charges by anyone who is accustomed to weigh testimony.

The charges preferred against McDermit in the Brown case, in the rule to show cause, which was entered January 6th, 1899, are in substance:

*First.* That McDermit received the sum of $550 from Brown for the purpose of instituting for him proceedings for divorce, but that he has failed to institute such proceedings though often requested to do so.

*Second.* That McDermit obtained $300 from Brown as security for a bail bond in the desertion case, which was to be returned to said Brown at the conclusion of said suit, but that he has unlawfully converted said sum to his own use.

It is admitted that on March 7th, 1898, McDermit received a fee of $550 from Brown to institute proceedings on his behalf for a divorce. It is admitted that on the 17th of June, 1898, Brown made a demand on him for a return of the money on the ground that he had done nothing to earn it, and it is also admitted that no proceedings were instituted to obtain the divorce until February 7th, 1899, a month after these disbarment proceedings were commenced.

It is likewise admitted that the $300 in question was received by McDermit to indemnify him as surety on the bail bond, and that it was to be returned to Brown at the conclusion of the suit for desertion, if Brown was acquitted.

Upon the uncontroverted facts, it is difficult to resist the conclusion that the stronger-minded man has influenced and used the weaker to aid him in suppressing the truth.

In the opinion of the court, McDermit has been unfaithful to his clients; he has obtained money from them for which he failed and neglected to render any adequate service, and he has retained for his own use money which he received from them for other purposes.

We regret the necessity, but feel constrained to strike the name of Frank M. McDermit from the roll of attorneys and counselors of this court.

To fail in this duty would be to withhold our condemnation of the wrong of which he has been guilty, and the court would, in the public mind, be justly held responsible for any like illegal practices hereafter engaged in by one who had abused the confidence heretofore reposed in him.

Let a rule be entered accordingly.