IN THE MATTER OF WENDELL R. WILSON, AN ATTORNEY
AT LAW.

Argued September 11, 1979—Decided December 19, 1979.

*Ms. Colette A. Coolbaugh,* Secretary, argued the cause for the Disciplinary Review Board.

No appearance was made on behalf of respondent.

The opinion of the court was delivered by

WILENTZ, C. J.

In this case, respondent knowingly used his clients' money as if it were his own. We hold that disbarment is the only appropriate discipline. We also use this occasion to state that generally all such cases shall result in disbarment. We foresee no significant exceptions to this rule and expect the result to be almost invariable.

Of the eight complaints filed against respondent with District Ethics Committee VIII (Middlesex County), two involved misappropriation. In one, respondent failed for almost two years to turn over $23,000—the proceeds from the sale of a house—to the client. After the ethics complaint was filed, respondent paid the client but never accounted for the location or use of the funds in the interim. In the other, respondent obtained money for a client in the form of a $4,300 check to the client's order. Respondent then forged the client's endorsement, deposited the proceeds in his own trust account, and has yet to turn the funds over to the client.

Respondent's professional misconduct extends beyond these instances of misappropriation. In the other complaints, the Disciplinary Review Board found that respondent lied to clients, wantonly disregarded their interests, and advised them to commit fraud. Moreover, he was inexcusably uncooperative in the ethics proceedings. The Disciplinary Review Board recommended disbarment.

It is clear from all of this that respondent is unfit to be a lawyer. We do not, however, discuss any charges other than misappropriation since disbarment is mandated by that alone.

## I.

## MISAPPROPRIATION

Misappropriation of clients' funds is both a crime (*N.J.S.A.* 2C:20–9 (superseding *N.J.S.A.* 2A:102–5, which was repealed by *L.* 1978, *c.* 95, 2C:98–2)) and a direct violation of Disciplinary Rule 9–102 of the Code of Professional Responsibility. Included in the specific commands of this rule is the requirement that "a lawyer shall  *  *  * [p]romptly pay or deliver to the client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive." DR 9–102(B)(4). Our former Canon of Professional Ethics told the lawyer not only what he must do, but what he must *not* do:

> Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him. [Canon 11].

Like many rules governing the behavior of lawyers, this one has its roots in the confidence and trust which clients place in their attorneys. Having sought his advice and relying on his expertise, the client entrusts the lawyer with the transaction—including the handling of the client's funds. Whether it be a real estate closing, the establishment of a trust, the purchase of

a business, the investment of funds, the receipt of proceeds of litigation, or any one of a multitude of other situations, it is commonplace that the work of lawyers involves possession of their clients' funds. That possession is sometimes expedient, occasionally simply customary, but usually essential. Whatever the need may be for the lawyer's handling of clients' money, the client permits it because he trusts the lawyer.

It is a trust built on centuries of honesty and faithfulness. Sometimes it is reinforced by personal knowledge of a particular lawyer's integrity or a firm's reputation. The underlying faith, however, is in the legal profession, the bar as an institution. No other explanation can account for clients' customary willingness to entrust their funds to relative strangers simply because they are lawyers.

Abuse of this trust has always been recognized as particularly reprehensible:

> [T]here are few more egregious acts of professional misconduct of which an attorney can be guilty than misappropriation of a client's funds held in trust. [*In re Beckman*, 79 *N.J.* 402, 404–05 (1979)].

*See also In re Miller*, 65 *N.J.* 580, 581 (1974); *In re Spielman*, 62 *N.J.* 432, 434 (1973); *In re Malanga*, 45 *N.J.* 580, 583 (1965); *In re Gavel*, 22 *N.J.* 248, 264 (1956). Recognition of the nature and gravity of the offense suggests only one result—disbarment. "Such conduct is of so reprehensible a nature as to permit of only one form of discipline." *In re Ryan*, 60 *N.J.* 378, 379 (1972).

Despite this strong condemnation, results in misappropriation[1] cases have varied because of circumstances which the

---

1Unless the context indicates otherwise, "misappropriation" as used in this opinion means any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom.

Court has regarded as mitigating: the economic and emotional pressures on the attorney which caused and explained his misdeed; his subsequent compliance with client trust account requirements; his candor and cooperation with the ethics committee; his contrition; and, most of all, restitution. The presence of a combination of these has occasionally resulted in suspension, ranging from six months to three years, rather than disbarment.

■ It is therefore important that we reemphasize that the principal reason for discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general. This reason for discipline is mentioned in some misappropriation cases and not in others. While it may only rarely have been stressed in the past, we are now inclined to view it as controlling in these cases.

We have no doubt that the bar is as anxious as we are to preserve that trust. Its preservation is essential to public acceptance of reforms that may be proposed by the bench and bar together. Mistrust may provoke destructive change. Public confidence is the only foundation that will support constructive reform in the public interest while preserving the finest traditions of the profession.

From that point of view, anything less than strict discipline in cases like this would be a disservice to the bar, the judiciary and the public.

What are the merits in these cases? The attorney has stolen his clients' money. No clearer wrong suffered by a client at the hands of one he had every reason to trust can be imagined. The public is entitled, not as a matter of satisfying unjustifiable expectations, but as a simple matter of maintaining confidence, to know that never again will that person be a lawyer. That the moral quality of other forms of misbehavior by lawyers may be no less reprehensible than misappropriation is beside the point. Those often occur in a complex factual setting where the applicability or meaning of ethical standards is uncertain to the

bench and bar, and especially to the public, which may not even recognize the wrong. There is nothing clearer to the public, however, than stealing a client's money and nothing worse. Nor is there anything that affects public confidence more—much more than the offense itself—than this Court's treatment of such offenses. Arguments for lenient discipline overlook this effect as well as the overriding importance of maintaining that confidence.

## II.

### MITIGATING CIRCUMSTANCES

No one need argue whether the moral reprehensibility of this kind of behavior justifies disbarment: all admit it. The only question is whether mitigating circumstances might call for lesser discipline in particular cases. We discuss restitution first since it is relied upon most often.

In the context of professional discipline, restitution suggests an "honesty of compulsion," proving mostly that the lawyer is anxious to become a lawyer again and that he is able somehow to raise the money. Practically every lawyer facing such charges *wants* to remain a lawyer, but not every lawyer is able to raise the money. As early as 1915, the Supreme Court sitting *en banc* noted the irrelevance of this factor:

"We do not attach very much importance, as a rule, to the matter of restitution, because that may depend more upon financial ability or other favoring circumstances than repentance or reformation. A thoroughly bad man may make restitution, if he is able, in order to rehabilitate himself and regain his position in the community; and a thoroughly good man may be unable to make any restitution at all." [*In re Hawkins*, 87 A. 243, 247 (Del.Super.Ct.1913)]. Without underestimating the importance of restitution, a moment's reflection must convince one that of all the factors that enter into the question of moral fitness, the mere circumstance of restitution is the one most likely to be fortuitous and to depend upon conditions and circumstances that afford no reliable test of moral qualities. The money may have come from wealthy relatives, or from a lucky speculation, or from engaging in some alien business venture, or it may have been borrowed, in which case the old liability is apparently extinguished by

the creation of a new one. Taken in connection with other circumstances, restitution may be of the utmost significance, but this, oftener than not, is due to such other circumstances rather than to the mere fact of non-restitution; as, for instance, if the former attorney became possessed of sufficient money with which to make restitution but refused so to apply it. [*In re Harris*, 88 *N.J.L.* 18, 22–23 (Sup.Ct.1915) (*en banc*)].

Restitution may compensate an individual complainant for the financial loss suffered; conceivably, it may partially restore the shattered faith of a particular client. It does not, however, significantly retard the subtle but progressive erosion of public confidence in the integrity of the bench and bar.

When restitution is used to support the contention that the lawyer intended to "borrow" rather than steal, it simply cloaks the mistaken premise that the unauthorized use of clients' funds is excusable when accompanied by an intent to return them. The act is no less a crime. *W. LaFave & A. Scott, Criminal Law*, § 89 at 653–54 (1972); *see also United States v. Titus*, 64 *F.Supp.* 55, 56 (D.N.J.1946).[2] Lawyers who "borrow" may, it is true, be less culpable than those who had no intent to repay, but the difference is negligible in this connection. Banks do not rehire tellers who "borrow" depositors' funds. Our professional standards, if anything, should be higher. Lawyers are more than fiduciaries: they are representatives of a profession and officers of this Court.

The overwhelming majority of misappropriation cases involves lawyers who undoubtedly intended to return the funds. They misappropriate initially with precisely such intent. Anticipated

---

[2]Criminality is not determinative here, however, although it strongly supports our conclusion; nor is our conclusion affected by the consideration accorded restitution in sentencing. Policies underlying criminal law may not necessarily coincide with those governing disciplinary matters. The policy described in this opinion, leading to disbarment in these cases, would be ill served if "borrowing" regularly resulted in lesser discipline.

money for repayment fails to materialize. Other clients' trust funds are then used for "restitution," and the initial embezzlement spawns many more. Wholesale exemption from strict discipline for misappropriation would result if such "borrowing" were excused.

■ Judicial consideration of restitution as a mitigating factor in disciplinary proceedings creates the impression that sanctions are proportioned in accordance with ability to pay, rather than gauged against the seriousness of the misconduct. Furthermore, according significance to restitution leads to an obvious and substantial possibility of unjust discrimination.

■ At worst, refusal to consider restitution in this class of cases removes an incentive for compensation of injured parties. Encouraging restitution in individual cases is a worthy purpose, but the lenient discipline needed to achieve it conflicts with the paramount goal of preserving public confidence in the entire bar. From this point of view, compensation of injured parties should not be deemed an appropriate function of our disciplinary process.[3]

We find it similarly unpersuasive that the attorney in such a case has finally put together reliable records and brought his trust account into balance. It is the least that one would expect. Its only significance is that it would be doubly unthinkable to permit resumption of practice by an offending attorney who remained unwilling or unable to set up proper books and records.

■ The inexperience or, conversely, the prior outstanding career, of the lawyer, often considered a mitigating factor in

---

[3]If the argument ever had any weight, the existence and effectiveness of the Clients' Security Fund has greatly weakened it. In this case, for instance, claims for the misappropriations have been filed with the Fund and payment will presumably follow.

disciplinary matters, seems less important to us where misappropriation is involved. This offense against common honesty should be clear even to the youngest; and to distinguished practitioners, its grievousness should be even clearer.[4]

The considerations that must deeply trouble any court which decrees disbarment are the pressures on the attorney that forced him to steal, and the very real possibility of reformation, which would result in the creation of a new person of true integrity, an outstanding member of the bar. *See, e. g., In re Harris, supra,* 88 *N.J.L.* at 24–26. There can be no satisfactory answer to this problem. An attorney, beset by financial problems, may steal to save his family, his children, his wife or his home. After the fact, he may conduct so exemplary a life as to prove beyond doubt that he is as well equipped to serve the public as any judge sitting in any court. To disbar despite the circumstances that led to the misappropriation, and despite the possibility that such reformation may occur [5] is so terribly harsh as to require the most compelling reasons to justify it. As far as we are concerned, the only reason that disbarment might be necessary is that any other result risks something even more important, the continued confidence of the public in the integrity of the bar and the judiciary.[6]

---

[4]We deem the unlikelihood of subsequent misappropriation irrelevant in these cases. In practically all of them, even where there are no mitigating factors, recurrence of the misbehavior is highly unlikely. No one suggests that, alone, it is sufficient to warrant lesser discipline. To state that we might nevertheless consider it "but only in conjunction with other factors" falsely attributes importance to a factor almost universally present in these matters.

[5]Almost without practical remedy, for our research reveals only three orders of reinstatement following disbarment over the past hundred years. *In re Mink,* 60 *N.J.* 609 (1973); *In re Isserman,* 35 *N.J.* 198 (1961); *In re Wendel,* 3 *N.J.Misc.* 312 (Sup.Ct.1925); *see In re Greenberg,* 21 *N.J.* 213, 225 (1956); *see generally In re Meyer,* 3 *N.J.Misc.* 168 (Sup.Ct.1925); *In re Harris, supra,* 88 *N.J.L.* at 23.

[6]The potential misery that might be inflicted on the client seems to receive little consideration in the cases perhaps because those which impose disci-

In summary: maintenance of public confidence in this Court and in the bar as a whole requires the strictest discipline in misappropriation cases. That confidence is so important that mitigating factors will rarely override the requirement of disbarment. If public confidence is destroyed, the bench and bar will be crippled institutions. Functioning properly, however, in the best traditions of each and with full public confidence, they are the very institutions most likely to develop required reform in the public interest.

For the reasons stated, we conclude that disbarment is mandated. Respondent's name will be stricken from the rolls.

*For disbarment*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*Opposed*—None.

## ORDER

It is ORDERED that WENDELL R. WILSON of Carteret be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that WENDELL R. WILSON be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with all the regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.

---

pline less than disbarment *seem invariably to involve complete restitution.* Obviously the weakened deterrent effect caused by this lesser discipline may result in inflicting that misery on other clients for whom there will be no restitution. Looked at differently, the sympathy engendered by the impossible plight of the attorney which caused him to steal is offset by the fact that he did so, most often, without regard for the possibility that he might be inflicting the same misery, or worse, on his innocent client. *See, e. g., In re McDermit,* 63 *N.J.L.* 476, 482–88 (Sup.Ct.1899).