## In re Anonymous No. 5 D.B. 80

Disciplinary Board Docket no. 5 D.B. 80.

To The Honorable Chief Justice and Justices of The Supreme Court of Pennsylvania

KRAWITZ, *Member,* January 23, 1981— Pursuant to Pa.R.D.E. 208(d), the Disciplinary Board of the Supreme Court of Pennsylvania (board) submits its finding and recommendations to your honorable court with respect to the above petition for discipline.

## I. HISTORY OF PROCEEDINGS

On February 21, 1980, the Office of Disciplinary Counsel charged Attorney [  ] (respondent) with

acts of misconduct including conduct involving dishonesty, fraud, deceit or misrepresentation and engaging in conduct that adversely reflects on his fitness to practice law and failure to promptly pay or deliver to the client, as requested by the client, the funds, securities, or other properties in his possession.

After hearing, the hearing committee found that respondent had violated D.R. 1-102(A)(6) and recommended a private reprimand. Exceptions were filed by the Office of Disciplinary Counsel with oral argument requested and a panel was designated consisting of Sidney L. Krawitz, Esq., Chairman, Mary Bell Hammerman, Esq., and John C. Anderson, Esq., which said panel heard oral argument on December 10, 1980 and rejected the recommendation of the hearing committee and makes the following recommendation to the Supreme Court.

## II. FINDINGS OF FACT

1. That respondent at the time of the alleged misconduct was an attorney at law, duly admitted to practice before the Supreme Court of Pennsylvania and had been a commercial and corporate attorney for more than 18 years and established his own law firm in 1961.

2. As of May 23, 1978 and for approximately nine years previous thereto, respondent had an ongoing attorney-client relationship with [A] during which time he represented her including preparation of her Federal and state tax returns for the years 1973 through 1977 and was therefore knowledgeable as to the nature, extent and whereabouts of her personal assets, including a savings account at [B] Savings and Loan Association (hereinafter [B] S&L) account no. 1.

3. During the period of time specified hereinabove, respondent had and possessed on May 23, 1978, a valid power of attorney executed by [A] to him on December 8, 1970.

4. On or about May 23, 1978, respondent appeared at [B] S&L without [A] and signed her name to a statement of loss for [B] S&L savings account no. 1.

5. On the aforesaid date, respondent signed [A's] name to a withdrawal slip requesting withdrawal of the sum of $10,550.33 from [B] S&L savings account no. 1.

6. On or about May 23, 1978, respondent opened a new savings account at [B] S&L in [A's] name, account no. 2, using his office address, on the signature card for said account.

7. On May 23, 1978, respondent had the sum of $10,550.33, the balance of the closed savings account, transferred to the new savings account no. 2.

8. On May 23, 1978, respondent withdrew the sum of $8,000 from [B] S&L savings account no. 2 and secured a check from [B] S&L in that amount payable to a real estate firm. This was done without either [A's] consent or knowledge.

9. The aforementioned check was thereafter used by respondent as a down payment on certain real estate, a personal residence, which then was to be and now is in the names of respondent, and [   ], his wife, as sole owners in fee.

10. [A] did not have an interest in the aforementioned real estate and did not authorize use of her funds by respondent *in any amount* for the purpose of purchasing said property.

11. That the power of attorney made, executed and delivered by [A] to respondent under date of December 8, 1970, gave to respondent the power to

make deposits in her savings account. Nevertheless, respondent after May 23, 1978, never made any effort to make a deposit for $8,000 in her name in [B] S&L savings account no. 2 and in this manner return her $8,000 to said account.

12. The sum of $8,000 was returned to [A] by respondent on July 11, 1978 when demand was made for same by [C], Esq., and said sum was paid by a check drawn by respondent on his law firm's account and not drawn on the personal funds of respondent.

13. That respondent admitted and conceded that [A] was not aware that he was withdrawing $8,000 from her [B] S&L savings account and that he was using these funds for a down payment on property which he was purchasing for himself and his wife.

14. That respondent conceded and admitted that he did not tell [A] when he spoke to her subsequent to May 23, 1978, that he had withdrawn funds from her account for his own purposes.

15. On or about July 20, 1978, upon demand by [C] the sum of $57.37 was paid to [A] by respondent, representing interest on the $8,000.

16. That [A] had been and was on May 23, 1978 and subsequent thereto, a mentally ill person having previously had a mastectomy and incidents of deep depression and other physical and mental problems and needed the assistance of respondent to protect and not endanger her assets.

17. That respondent, by withdrawing the sum of $8,000 from the savings account of [A], client for whom he was an attorney in fact, without her knowledge or consent and securing a check in that amount payable to a real estate firm, which he then used as a down payment on a $100,000 house he was purchasing for himself and his wife, and fail-

ing to make restitution for 47 days until another attorney demanded same, misappropriated his client's funds for his own uses and purposes in violation of D.R. 1-102(A)(3), 1-102(A)(4), 1-102(A)(6), and 9-102(B)(4).

## III. DISCUSSION

By stipulation of respondent together with other testimony, the record unequivocally and without contradiction establishes that respondent attempted to take advantage of [A], a depressed alcoholic and cancer patient, by stealing $8,000 from her bank account to use for respondent's own purposes. The record indicates the great trust that [A] had in respondent, which trust was violated by the misappropriation of $8,000 of her funds and only returned 47 days later, after demand was made by a fellow attorney. It is interesting to note that even then the account from which restitution was made was not the personal account of respondent, but by a check drawn on respondent's law firm, a professional corporation.

Respondent in his explanation of his conduct, detailed that he had a special knowledge of [A's] assets and problems and that he was aware that as a result of those problems, she might be unable to discover, as someone else would, embezzlement or misappropriation. Respondent had an extensive power of attorney, marked Exhibit P-I in the record, and under the power of attorney he could not only withdraw money from her bank accounts, but he also had the power to make deposits and even though he had that power, no evidence was given to show that in 47 days he had taken the time to go to the savings and loan to redeposit the $8,000 in her account. Respondent abused the trust of a distressed client and took special advantage of a client

who, by reason of her mental and physical health, was vulnerable. Here was a client who needed special protection and instead was put upon by an unscrupulous individual. Here the promptness of the restitution, the record will show, resulted from the promptness of the discovery by [A] that her funds were missing and her immediate retaining of another attorney who made demand that restitution be made and only then was an effort made to do so. Respondent, in his testimony, attempts to excuse himself by saying that he intended to "borrow" rather than to convert [A's] funds.

First of all, restitution was made only after demand was made for the same, and second, this matter was addressed by the New Jersey Supreme Court in the case of Matter of Wilson, 81 N.J. 451, 458, 409 A. 2d 1153 (1979), in its rejection of a similar defense of misappropriation of funds. In it the court said:

"When restitution is used to support the contention that the lawyer intended to 'borrow' rather than steal, it simply cloaks the mistaken premise that the unauthorized use of clients' funds is excusable when accompanied by an intent to return them. The act is no less a crime . . . Lawyers who 'borrow' may, it is true, be less culpable than those who had no intent to repay, but the difference is negligible in this connection. Banks do not rehire tellers who 'borrow' depositors' funds. Our professional standards, if anything, should be higher. Lawyers are more than fiduciaries: they are representatives of a profession and officers of this Court.

"The overwhelming majority of misappropriation cases involves lawyers who undoubtedly intended to return the funds. They misappropriate initially with precisely such intent. Anticipated money for repayment fails to materialize. Other

clients' trust funds are then used for 'restitution,' and the initial embezzlement spawns many more. Wholesale exemption from strict discipline for misappropriation would result if such 'borrowing' were excused."

"Unless the context indicates otherwise, 'misappropriation' as used in this opinion means any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." Fn. 1, p. 455.

Accordingly the court noted that the defense of "borrow" would have a widespread debilitating effect on the disciplinary system and we urge the court to adopt the posture set forth by your sister court in the State of New Jersey. Respondent's conduct established a violation of D.R. 1-102(A)(3), 1-102(A)(4), 1-102(A)(6), and 9-102(B)(4) and establishes that he is unfit to practice law from the standpoint of protecting the public and the courts, that his acts of dishonesty, fraud and deceit, moral turpitude and dishonesty adversely reflects on his ability to practice law. The conduct of respondent indicates conduct rendering him presently unfit to continue in the practice of law.

## IV. HEARING COMMITTEE ACTION

The hearing committee recommended respondent be given a private reprimand without probation.

## V. DISCIPLINARY BOARD RECOMMENDATION

The Disciplinary Board did not concur with the findings of the hearing committee as heretofore set

forth. The Disciplinary Board adopted the hearing committee's findings of fact as well as setting forth findings of fact which the hearing committee failed to recognize. The board felt that the magnitude of the respondent's actions in the matter required that the Disciplinary Board reject the recommendation of the hearing committee. Accordingly, the Disciplinary Board recommends that under the circumstances of this case, that a one year suspension from the practice of law is mandated and strongly suggests that the conduct such as that engaged in and admitted to by respondent, dictates at least the recommended suspension. In rejecting the hearing committee's recommendation of private reprimand, the board noted the two-fold purpose of disciplinary action, to protect the public and the courts from those unfit to function as attorneys and to maintain the confidence of both the public and the courts in the legal profession. The board, therefore, concluded with the recommendation of a one year suspension.

Mary Bell Hammerman and John C. Anderson dissent and would recommend a three month suspension. Herbert J. Johnson, Jr. and Robert C. Daniels did not participate in the adjudication.

ORDER OF PENNSYLVANIA SUPREME COURT

PER CURIAM, July 2, 1981—There having been entered by this court an order dated March 12, 1981, suspending [respondent] immediately and a rule issued upon him to show cause why he should not be disbarred from the practice of law, upon consideration of the briefs filed and oral argument presented, it is ordered that the rule be and is hereby discharged; and it is further ordered that the said [respondent] be and is hereby suspended

from the Bar of the Commonwealth of Pennsylvania for the period of two years commencing with the date of this order.

Mr. Justice Larsen, Mr. Justice Flaherty and Mr. Justice Kauffman would disbar.