IN THE MATTER OF ARNOLD E. BROWN, AN
ATTORNEY-AT-LAW.

Argued November 6, 1985—Decided May 22, 1986.

*Richard J. Engelhardt,* Assistant Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Frank P. Lucianna* argued the cause for respondent (*Lucianna, Bierman & Stillman,* attorneys).

PER CURIAM.

Acting on a presentment filed by a District Ethics Committee (the Committee), the Disciplinary Review Board (DRB) concluded that respondent, Arnold E. Brown, was guilty of "a number of incidents of misconduct that reveal an overall inability properly to represent clients and to exhibit proper judgment in the management of trust accounts." Although it agreed with the Committee's finding that "respondent was out-of-trust for almost four years," the DRB nevertheless determined that "this is not a misappropriation case as defined in *In re Wilson*, 81 *N.J.* 451 (1979)," and therefore recommended a one-year suspension.

We disagree. Our independent review of the record leads to the conclusion, established by clear and convincing evidence, that this proceeding is indeed controlled by *Wilson* and that respondent should be disbarred.

I

Although the Committee and the DRB dealt with complaints of four clients of respondent, the source of respondent's ethical problems came to light only after an audit of his books and records by the Division of Ethics and Professional Services (DEPS), predecessor of the Office of Attorney Ethics. The client complaints produced findings by the DRB of respondent's gross negligence in violation of *DR* 6–101(A)(1) (Annie Lou Gibbs); failure to preserve the identity of client funds and intentional delay in payment of taxes (Henry Wright); intentional failure to carry out a contract of employment contrary to *DR* 7–101, and failure to preserve the identity of a client's funds in violation of *DR* 9–102 (Mildred Hurt); and, again

contrary to *DR* 9–102, failure to preserve the identity of trust-account funds (Nathaniel and Mary Roberson).

The Roberson matter involved respondent's delivery of a trust-account check to the buyer's attorney in a real-estate transaction. The check represented deposit funds of $6900 held in escrow by respondent, who represented the seller. When the deal fell through, the buyer sought the return of the deposit. Because respondent's trust account check was twice dishonored, the buyer's attorney notified the ethics authorities, after which respondent delivered certified checks totalling $6900. It was the ethics complaint arising out of this transaction that prompted the DEPS audit, which is the object of our focus.

The audit covered the period August 1981 through July 1982. The trust accounts could not be reconciled because respondent was unable to produce individual client trust records. The auditor concluded that respondent's trust account "regularly had balances lower than $6900 and was frequently deficient."

Respondent's explanation—and the heart of his defense—is that in March 1978 he deposited in his trust account a $20,000 check of a client, Astroscope, Inc. Instead of waiting for the funds to clear the account before disbursing them, as required by *DR* 9–102, respondent issued checks in accordance with the client's instructions. When the bank dishonored the $20,000 check, the client was unable to make good on the check. The result, then, was a $20,000 deficiency in respondent's trust account. The client thereafter filed for bankruptcy.

Rather than reveal this unhappy turn of events to all the affected parties and to the attorney disciplinary authorities, or take steps towards restitution of the monies lost, respondent continually invaded the trust funds of one client to pay another. As respondent's brief puts it,

[h]e was forced into a process commonly known as "lapping," whereby the designated funds of one client are used to pay for another client's needs. However, [because respondent was] a sole practitioner, the sum was too great for respondent to make up.

This "lapping" process continued for more than four years, up until the time of the audit.

Respondent's difficulties were compounded in April 1980, when the Internal Revenue Service seized $8,098 from an interest-bearing escrow account that respondent had opened on behalf of his client Johnson. The account was characterized by a couple of peculiarities: it was not denominated as a "trust account," and the social security number on the account was respondent's, not the client's. The IRS took custody of the funds to pay outstanding liens on personal taxes owed by respondent. Again respondent resorted to "lapping" in order to pay off Johnson. The result was that as of April 1980 his trust account was short more than $28,000, rather than the original $20,000.

Respondent's effort to make up the shortage from the time it was originally created by his drawing on funds not yet cleared by the bank consisted of his leaving earned legal fees in his trust account. Although this may have made a dent in the shortage from time to time, it did not come near returning the account to an in-trust condition during the four-year span. As the auditor concluded on the basis on respondent's records and admissions in the course of the audit,

Mr. Brown intentionally used new client trust funds to cover deficiencies from prior matters, as well as for office expenditures, on a routine and regular basis.

    \*      \*      \*      \*      \*      \*      \*      \*

In conclusion, it appears that Mr. Brown had commingled trust funds over an extended period of time. Further, he has not maintained adequate trust records within the provisions of 1:21-6. It appears that Mr. Brown's trust account has a deficiency of $28,000 or more. Again, the extensive commingling and inadequate record keeping preclude a more precise appraisal of the deficiency at this time.

The auditor's comment about "office expenditures" refers to respondent's use of trust monies not simply for the purpose of taking from one client to pay another but also for paying both his secretary's salary and the monthly rental for his law office.

It was not until September 1982, after ethics complaints had been filed and the audit had been completed, that respondent

refinanced his home and restored the missing funds to the trust account, having first recouped $15,000 of the original $20,000 from the bankrupt client. His explanation for not having taken this step earlier was that he was too embarrassed to reveal to his wife what had happened.

## II

Respondent's position, as set forth in his brief, is that "Mr. Brown *never* used his client's funds as if they were his own. He never took any funds out of his trust account for his own personal use. He was simply trying to correct a situation that had been caused by a bankrupt client." But that argument, apparently accepted by the DRB, overlooks the essential nature of the disciplinary infraction: the steps that respondent took to "correct" the situation amounted to nothing less than the knowing invasion of the funds of one client to pay another client. Moreover, contrary to respondent's assertion that he never received any personal benefit from the "confusion" of funds in his trust account, he kept his office running on money that belonged to his clients; he avoided the re-mortgaging of his home and the interest charges on that mortgage; and the lien for taxes was paid to the IRS. And although respondent's problems originated in March 1978, before our decision in *Wilson, supra,* 81 *N.J.* 451, his unauthorized invasion of the trust account continued for two and a half years beyond the date of that opinion.

Respondent cannot avoid the impact of *Wilson* by relying on his having been victimized by a client who gave him a bad check and by demonstrating the heroic nature of his efforts to recover from that calamitous set-back. For more than four years thereafter he misused trust monies—knowingly so. That his motivation for doing so may have been admirable, even noble, is unavailing, for as *Wilson* established:

"[M]isappropriation" * * * means any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unautho-

rized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom. [81 *N.J.* at 455 n. 1.]

We recently had occasion to re-examine *Wilson*, recognizing that the rule of that case may be viewed as unremitting, inexorable in its application. And so it is. For as we pointed out in *In re Noonan*, 102 *N.J.* 157 (1986),

[t]he misappropriation that will trigger automatic disbarment under *In re Wilson*, 81 *N.J.* 451 (1979), disbarment that is "almost invariable," *id.* at 453, consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking. It makes no difference whether the money is used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he ultimately did reimburse the client; nor does it matter that the pressures on the lawyer to take the money were great or minimal. The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mind, are irrelevant: it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment.

> \*     \*     \*     \*     \*     \*     \*     \*

The presence of "good character and fitness," the absence of "dishonesty, venality, or immorality"—all are irrelevant. While this Court indicated that disbarment for knowing misappropriation shall be "almost invariable," the fact is that since *Wilson*, it has been invariable. [*Id.* at 159–60 (footnote omitted).]

We quote at such length from *Noonan* because the explication of *Wilson* fits so closely the situation before us. Even assuming that respondent's difficulties originated with a scoundrel who sought to pass a bad check, there is no excusing Brown's constant dipping into his trust account for four and a half years thereafter. There could scarcely be a clearer case of knowing misappropriation of funds in violation of *DR* 9–102.

### III

Respondent's name will be stricken from the roll. He is to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For disbarment*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.

## ORDER

It is ORDERED that ARNOLD E. BROWN of ENGLEWOOD, who was admitted to the bar of this State in 1957, be disbarred from the practice of law, and it is further

ORDERED that ARNOLD E. BROWN reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that ARNOLD E. BROWN be permanently restrained and enjoined from practicing law; and it is further

ORDERED that ARNOLD E. BROWN comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred, or resigned attorneys.