IN THE MATTER OF VICTOR LIBRIZZI, JR., AN ATTORNEY-AT-LAW.

Argued November 28, 1989—Decided February 16, 1990.

*Paula T. Granuzzo,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Frank P. Lucianna* argued the cause for respondent (*Lucianna & Lucianna,* attorneys).

PER CURIAM.

This disciplinary proceeding results from a random compliance audit of the trust funds of respondent, Victor Librizzi, Jr., by the Office of Attorney Ethics (OAE) pursuant to Rule 1:21–6(c). On receipt of the auditor's report, the OAE filed a

complaint with the District V–C Ethics Committee (DEC) charging the respondent with a number of ethical infractions. The charges included failure to maintain his trust account in accordance with Rule 1:21–6; in violation of *DR* 9–102(C) (*RPC* 1.15(d)); failure to maintain cash receipts and disbursement journals and failure to reconcile the trust account on a regular basis, in violation of *DR* 9–102(B) (*RPC* 1.15(a)); failure to safeguard clients' funds, in violation of *DR* 9–102(B) (*RPC* 1.15(a)); commingling of personal and clients' funds, in violation of *DR* 9–102(A); misappropriation of clients' funds, in violation of *DR* 9–102 and *DR* 1–102(A)(4) and (6); borrowing from trust account funds and replenishing of the trust account to replace misappropriated funds, in violation of *DR* 9–102(B)(1) (*RPC* 1.15(a)), and *DR* 9–102 (*RPC* 1.15), and *DR* 1.102(A)(4) and (6) (*RPC* 8.4(c)).[1]

After a hearing, the DEC concluded that respondent's conduct was unethical. He violated *DR* 9–102 and *DR* 1–102, by his failure to keep proper records, reconcile his trust account, maintain contemporaneous ledger cards, and properly safeguard clients' funds. However, because the DEC found no clear and convincing evidence that respondent knowingly misappropriated client funds, it recommended a private reprimand.

On its review of the record, the Disciplinary Review Board (DRB) found that the DEC's finding of unethical conduct was fully supported by clear and convincing evidence. The DRB concluded that respondent was grossly negligent in maintaining his trust account records, in violation of *DR* 9–102 and superseding *RPC* 1.15, but found that respondent had not knowingly misappropriated his trust account. A five-member majority of the DRB recommended that respondent be suspended from the practice of law for one year, two members recom-

---

[1]The Rules of Professional Conduct replaced the Disciplinary Rules effective September 1, 1984. Respondent's actions occurred both before and after that date. Hence, both the Disciplinary Rules and the Rules of Professional Conduct apply.

mended that respondent be disbarred and one member conclud-
ed that a six month suspension was proper. Our independent
review of the record leads us to conclude that a six-month
suspension is the appropriate discipline.

I

Respondent was admitted to the bar in 1967. Prior to the
filing of the complaint in this matter, respondent had an un-
blemished professional career. He has been a sole general
practitioner for the last sixteen years. His practice consisted
primarily of real estate matters and related litigation. Addi-
tionally, for the last twelve years he served as a municipal
prosecutor.

In May of 1985 respondent was randomly selected for an
OAE audit. After receiving notice of the audit and prior to
meeting with the OAE auditor, respondent attempted to recon-
cile the trust account records that were available. His reconcil-
iation showed a shortfall in his trust account of approximately
$25,000. He traced this shortfall primarily to two matters,
involving his clients Costanza and Maffie. However, respon-
dent could not identify the other sources of the $25,000 short-
age. In order to replenish his trust fund, he borrowed $25,000
from his parents.

At his meeting with the OAE auditor, respondent informed
her of the $25,000 shortage and of the mistakes he had made in
the Costanza and Maffie matters. The subsequent audit dis-
closed the other remaining shortage as resulting primarily from
the Moshier transaction.

The audit encompassed a review of respondent's trust ac-
count records from September 1, 1982, through August 31,
1985. Respondent admits that he did not maintain his records
in compliance with *Rule* 1:21-6. He never retained an account-
ant prior to the audit and maintained his own records. In his
own words, "charitably [the records] were in somewhat [sic]
disarray."

That is an understatement. There were no receipts and disbursements journals. There were no records available showing deposits in the trust account. Deposit tickets were not consistently marked with client names. No deposit notations were entered on check stubs. Client ledger cards were not properly maintained and did not consistently reflect deposit information, which had to be traced from the case files. Moreover, client ledger cards made available for the audit reflected inaccurate or omitted disbursements. For a twelve year period from the inception of his sole practice, from 1973 to 1985, respondent did not reconcile his trust account. He testified that the bank envelopes containing the trust account statements were not even opened.

Respondent maintained both a trust account and a business account. He paid both business and personal expenses from his business account. He also had three different lines of credit with his bank, a Check–King (overdraft protection up to $2,500 limit), revolving credit (unsecured promissory note, renewable every thirty days), and Insti–Credit (installment loans of varying amounts). Respondent's record keeping of his business account was only slightly less egregious than his record keeping of his trust account. He testified that he reconciled his business account "sporadically, every three to four months." However, he testified that "there was no particular need" to reconcile the business account more often because of his lines of credit, and based on his close relationship with the bank he was confident that the bank "never would bounce a check, never did and never will." Records of respondent's bank disclose that he had continuous new loans and renewals from as early as 1980.

Apparently respondent's assumption that the bank would never bounce a check was correct. No client suffered any financial injury or complained to any ethics committee. Respondent was never notified of any shortage in his trust account.

As stated previously, the $25,000 shortage primarily arose from transactions involving three clients, Constanza, Maffie and Moshier. In Costanza's matter, respondent received a check on February 22, 1984, in the amount of $4,768.36 to satisfy a tax lien on certain property previously owned by Costanza and on which he held a mortgage. Respondent stamped the check "Payable to Victor Librizzi Trust Account." Inadvertently, however, on that same day, respondent deposited the check in his business account. Five days later, respondent issued a trust account check in the amount of $4,700.60 payable to the Township of Montclair. A trust account ledger for Costanza lists the $4,700.60 disbursement. There is no debit entry of $4,768.36.

Similarly, in Maffie, respondent received a check payable to Maffie in the amount of $6,500, representing a real estate deposit. On January 13, 1984, respondent deposited the check in his business account without making any notation of such deposit on Maffie's ledger card. Subsequently, on February 14, 1984, respondent received an additional $1,500 deposit on the property, which he placed in his trust account, and noted on the Maffie ledger card. Thereafter, on March 28, 1984, respondent issued a trust-account check to the seller in the amount of $8,000, and noted that trust account disbursement on the ledger card.

In Moshier's case respondent again misdeposited the client's funds in his business account. On March 5, 1984, respondent deposited the buyer's draft of $9,500 in his business account. The Moshier ledger card erroneously indicates that the $9,500.00 draft had been deposited in the trust account. On May 3, 1984, respondent issued a trust-account check to Moshier in the amount of $9,500.00. Hence, in the first three months of 1984, respondent erroneously deposited in his business account total trust funds in the amount of $20,768.38.

The OAE relies heavily on client Tabatchnick's matter as evidence that respondent intentionally misappropriated funds.

The DRB in its Decision and Recommendation correctly sets forth the facts of the Tabatchnick transaction:

> In yet another matter, *Tabatchnick*, respondent withdrew from the trust account approximately $1,800.00, representing his counsel fee in connection with a real estate transaction that took place in May 1983. After that check was cashed, the bank notified respondent that one of Tabatchnick's checks, in the amount of $1,800, which had been deposited into respondent's trust account, had been dishonored. Respondent did not return the $1,800 fee to his trust account. Although he demanded another check from Tabatchnick, that 'second check was also returned for insufficient funds. Eventually, when respondent sued the client, Tabatchnick's father agreed to pay respondent in "dribs and drabs." Respondent did not deposit those payments in the trust account. From the time that the first Tabatchnick check was dishonored until the time that respondent cured the aforementioned $25,000 shortage in May 1985, a period of two years had elapsed.

Additionally, respondent made overpayments from the trust account to three clients, Pignatello, Mongiello, and Cooper, for accrued interest even though he failed to open interest-bearing accounts on behalf of those clients. In 1983 respondent also issued to himself trust-account checks for $750 and $500 which he deposited in his business account. On both dates, respondent's business account showed an overdraft. Respondent testified that he had no notice of those overdrafts. He also testified that he erroneously relied on the fact that excess recording and cancellation fees from real estate transactions had accumulated in his trust account since 1973. Although he had not calculated those fees, he assumed they totalled thousands of dollars.

## II

Respondent denies that he was aware of the trust account shortage prior to undertaking the reconciliation in anticipation of the audit. This was the first trust account reconciliation respondent performed since 1973. Respondent testified that the deposits in the *Costanza, Maffie,* and *Moshier* matters were inadvertent mistakes. He denied that they were intended to restore a business account shortage or to be otherwise used for personal purposes. The OAE alleges that respondent systematically misappropriated funds and that the Maffie misdeposit

of $6,500 on January 13, 1984, was intended to pay off respondent's $5,799.99 bank loan due on January 24, 1984. To refute that charge, respondent produced the testimony of an accountant, who reviewed respondent's records after the completion of the random audit to show that on the due date of the loan, one of the credit lines available to respondent had a zero balance, thus respondent would have been eligible for another loan to pay off the prior $5,799.99 loan. Indeed, respondent did use that credit line in order to deposit $7,500 into his business account on January 25, 1984. Accordingly, we find, as did the DEC and DRB, that the eleven day period between the time of the misconduct and the payment of the promissory note and the deposit of the instant credit weighs in respondent's favor.

With respect to Costanza and Moshier, respondent testified that monies came "in and out of his office fast"—often times ledger sheets were not made contemporaneously. In Costanza, the deposit was made on February 22, 1984 and disbursed on February 27, 1984—five days later. Moreover, the drafts deposited in the Costanza and Moshier matters are stamped payable to Trust Account.

We are impressed that the activity journal of respondent's bank revealed that respondent had continuous new loans and renewals dating from as early as 1980, varying in amounts from as low as $300 to as high as $11,400. Moreover, it appears that only three deposits, the last being fifteen months before the audit, were improperly deposited in respondent's business account between the period covered by the audit, September 1, 1982, to June 3, 1985, the implication being that respondent was not systematically misappropriating funds.

We also are impressed by the testimony of respondent's accountant (retained subsequent to the notice of the audit) at the DEC hearing. He referred to respondent as a "shoe box client"—maintaining all records, expenses, etc. in boxes. There appears to be little doubt that respondent's record keeping was grossly careless and inadequate. However, after reviewing

carefully every file, the accountant found no evidence of any "systematic invasion of clients' funds," or of any erroneous deposits other than the three noted previously.

The accountant further testified about the available lines of credit and the fact that respondent reported all of the misdeposited funds—those involving clients Maffie, Costanza and Moshier—as his own income in 1984. Moreover, the accountant testified that respondent made a net profit of approximately $45,000 in 1984. That profit was a little more than the amount made in 1983 and a little less than in 1985. Respondent did not live a lavish lifestyle. He resided in a modest home. His mortgage payment was small, with a $14,000 balance, as were his car loan and expenses.

With respect to respondent's testimony that he thought the checks were covered because of excess recording and filing fees deposited in the trust account since 1973, the accountant testified that it was not unusual for sole practitioners to allow filing fees and recording fees to accumulate in their trust accounts.

### III

Both the DEC and DRB found that respondent was grossly negligent in maintaining his trust account records, in violation of *DR* 9–102 and superseding RPC 1.15. Based on our independent review of the record we agree.

The key issue, therefore, is whether the trust-fund shortage was the result of knowing misappropriation or the product of inadvertent error or gross neglect in respondent's handling of his accounts and his funds.

As defined in *In re Wilson*, 81 *N.J.* 451, 455 n. 1 (1979), misappropriation means

> any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom.

The knowing misappropriation that will trigger automatic disbarment under *Wilson*

consists simply of a lawyer taking a client's money entrusted to him, *knowing that it is the client's money and knowing that the client has not authorized the taking.* It makes no difference whether the money is used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he ultimately did reimburse the client; nor does it matter that the pressures on the lawyer to take the money were great or minimal. The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mind, is irrelevant: *it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment.*

[*In re Noonan,* 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986) (emphasis added).]

■ An intentional or knowing misappropriation must be established by clear and convincing evidence. *In re Perez,* 104 *N.J.* 316, 324 (1986). Both the DEC and the DRB found that although a misappropriation occurred, it was not a knowing one. We agree. Based on our independent review of the record, we are unable to conclude by clear and convincing evidence that respondent knowingly misappropriated his clients' trust funds.

Our review confirms the following findings and conclusions of the DRB:

The Board agrees with the ethics committee's conclusion that the *Costanza, Maffie,* and *Moshier* deposits into respondent's business account were the product of inadvertence and not of evil design to utilize the funds for personal purposes. Corroborating this conclusion are the fact that the checks deposited in the *Costanza* and *Moshier* matters are stamped payable to respondent's trust account number and the fact that respondent had conveniently set up a multiple-credit line system to provide additional funds to his business account, as needed.

Respondent's most glaring violation occurred in the *Tabatchnick* matter. There, respondent issued a trust account check, to himself in the approximate amount of $1,800, representing counsel fees in a real estate transaction. After the check was cashed, the bank notified respondent that one of Tabatchnick's checks, which had been deposited into respondent's trust account, had been returned for insufficient funds. At that time, an obligation arose on respondent's part to make immediate restitution to the trust account of the monies withdrawn against uncollected funds.

Although respondent trusted that the bank would "never bounce a check" because of their close and long-standing business relationship and although respondent had the honest belief that there were "thousands of dollars" in excess recording fees accumulated in his trust account since 1973, his conduct in not making prompt restitution to the trust account smacked of gross

negligence. While the Board finds credible respondent's testimony that the accumulated recording fees exceeded $1,800, it strains credulity to believe that respondent never attempted to determine the exact amount of those excess fees. The same holds true for respondent's payments of interest to several clients, which payments he believed to be covered by the "thousands of dollars" left in the trust account.

Respondent's conduct differed from the conduct of respondents in *In re Fleischer*, 102 *N.J.* 440 (1986) (respondent acknowledged use of clients' funds and intentionally designed a bookkeeping system that prevented them from knowing whether they were clients' funds); *In re Warhaftig*, 106 *N.J.* 529 (1987) (respondent acknowledged that with full knowledge that it violated the rules he withdrew advance fees because of his cash flow problem); *In re Brown*, 102 *N.J.* 512 (1986) (respondent for four years knowingly invaded clients' trust funds through a "lapping" process whereby he designated funds of one client to pay for another client's needs, and for office expenditures, on a routine and regular basis).

Respondent did not intentionally set up his bookkeeping system to use clients' funds. Indeed, respondent's problem is that he had no bookkeeping experience. He knew little about sound record-keeping. Mcreover, as recognized by the DRB, respondent's conduct differed substantially from the conduct of the attorney in *In re Brown:*

Here, respondent was operating under the credible notion that the recording fees accumulated in the trust account for the period of 10 years—from 1973 to 1983—exceeded the amounts withdrawn for the payment of interest to clients and the amount of the Tabatchnick check which was dishonored, $1,800. While the Board strongly condemns respondent's grossly negligent conduct, it cannot conclude that respondent knew that there were insufficient funds in his trust account to cover those deficiencies.

Respondent's conduct is analogous to the conduct of the respondents in two very recent cases, *In re James*, 112 *N.J.* 580 (1988) and *In re Gallo*, 117 *N.J.* 365 (1989). In those cases the attorneys were guilty of flagrant recordkeeping violations but not of intentional misappropriations and suspended from the practice of law for three months. In those cases both

attorneys had followed the bookkeeping practices of their former older employers and therefore never understood that they were incorrectly keeping their trust accounts.

■ Poor accounting procedures do not excuse the use of clients' funds. Attorneys must have accounting procedures that prevent misappropriation of trust funds. *In re Fleischer, supra,* 102 *N.J.* at 447. Nonetheless, while "poor accounting should not, and does not, establish a *Wilson* defense; but poor accounting is not a *Wilson* violation absent evidence of a knowing misappropriation." *In re Simeone,* 108 *N.J.* 515, 521 (1987) (citation omitted). We agree with the DRB's finding in this regard.

> Here, respondent was inexcusably derelict in his obligation to attend to the accounting and bookkeeping details of his practice. It cannot be said, however, that respondent deliberately designed an accounting system that would enable him to misappropriate client funds. Respondent, a sole practitioner since 1973, had an active law practice. His staff consisted of one secretary, who was replaced on a full-time basis by respondent's wife in September 1984. Respondent did not employ the services of a bookkeeper or an accountant. Although the busy character of his practice and the absence of outside help to maintain his books and records constitute no excuse to his grossly negligent recordkeeping practices, they bear directly on the issue of whether respondent knowingly misappropriated client funds. The Board finds that respondent's "unhealthy ignorance" of the status of his trust account was unintentional and prevented him from committing a knowing misappropriation.

■ Although we find that respondent did not knowingly misappropriate funds his misconduct was extremely serious. His record-keeping was totally inadequate. Essentially he had no record-keeping of his trust account. The question then becomes, what sanction is appropriate? It is well established that the primary reason for discipline is not to punish the attorney but to protect the public against members of the bar who are unworthy of their trust. In determining appropriate discipline we consider the interests of the public, the bar and the respondent. *In re Kushner,* 101 *N.J.* 397, 400 (1986). We "recognize the significance of mitigating factors that weigh

against imposing the harshest sanction available." *In re Gallo,* supra, 117 *N.J.* at 374.

We find that the following mitigating factors exist in favor of respondent. He had an otherwise unblemished record for over twenty years of practice, none of his clients suffered financial injury as a result of his ethical violations, and when he realized his error, he moved quickly and took appropriate corrective measures, including hiring an accountant to handle his trust account. He still has an accountant and his present system is in compliance with the rules.

We therefore conclude that respondent should be suspended from the practice of law for a period of six months.

Respondent shall reimburse the Ethics Financial Committee for any administrative costs.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.

### ORDER

It is ORDERED that VICTOR LIBRIZZI, JR. of CEDAR GROVE, who was admitted to the bar of this State in 1967, be suspended from the practice of law for a period of six months, effective March 2, 1990, and until the further order of this Court; and it is further

ORDERED that VICTOR LIBRIZZI, JR. reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that VICTOR LIBRIZZI, JR. be restrained and enjoined from practicing law during the period of his suspension; and it is further

494

ORDERED that VICTOR LIBRIZZI, JR. comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.