619 A.2d 1007

IN THE MATTER OF HUGO L. MORAS, AN ATTORNEY-AT-LAW.

Argued December 1, 1992—Decided February 26, 1993.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Robert H. Jaffe* argued the cause for respondent (*Jaffe & Schlesinger,* attys.).

PER CURIAM.

Following an audit performed in the fall of 1986 by the Office of Attorney Ethics (OAE), the District VB Ethics Committee (DEC) on August 1, 1989, filed a complaint charging respondent, Hugo L. Moras, with record-keeping violations, commingling of personal and trust funds, and knowing misappropriation of client funds. Respondent, who has never had any other ethics complaints filed against him, does not dispute the charges of record-keeping violations or commingling. Furthermore, he has taken the necessary steps to prevent a recurrence of those charges. The critical charge is that of knowing misappropriation.

That charge arose from a transaction described as "the Hughes Matter." In that matter the DEC found that respondent was guilty of knowing misappropriation. The Disciplinary Review Board (DRB) disagreed, finding that the OAE had not proved by clear and convincing evidence that the misappropriation had been knowing.

As described by the DRB, the relevant facts in the Hughes matter are:

Isabel Hughes was respondent's friend of long-standing. Also, as an employee of her husband's real estate agency, she referred numerous clients to respondent. On November 20, 1985, Mrs. Hughes telephoned respondent to request that he issue to her order a check from his trust account in the amount of $17,900. The check was designed to set aside a judgment of foreclosure on real property in which Mrs. Hughes had an interest. According to Mrs. Hughes, the attorneys for the mortgagee insisted on receiving either a certified or a trust account check. Hence her request to respondent for a trust account check, which was to be covered by a corresponding check from her.

On the afternoon of November 20, 1985, Mrs. Hughes stopped by respondent's office to pick up the trust account check and deliver her check to him. She gave respondent two checks: one for $2,664 from a John J. Scura, payable to Isabel and Walter Hughes and endorsed over to respondent, and the other for $15,236, in the form of a personal check from Mrs. Hughes. Respondent, in turn, issued a trust account check No. 673 for $17,900, dated November 20, 1985, and payable to Isabel Hughes.

There is little agreement about what happened immediately after the exchange of the checks. According to the OAE auditor, respondent confessed to him that, before he issued the $17,900 trust account check, he telephoned Mrs. Hughes' bank to determine if there were sufficient funds in her account. The

bank informed him that there were not. Still according to the auditor, despite this knowledge, respondent issued the trust account check to Mrs. Hughes. Respondent also admitted to the auditor that he had not immediately deposited the $15,000 Hughes check because of the lack of sufficient funds. In fact, respondent never deposited this check in his trust account.

Mrs. Hughes, in turn, testified that, at the time that she presented the checks to respondent, she believed that there were enough funds in her account to cover them because she had arranged for a friend to advance her equivalent funds. She admitted that she still had not deposited the friend's check in her account when she gave respondent the $15,000 check, but she knew that her friend had more than enough funds in her account to cover the loan. Much to her dismay, however, two or three days after respondent issued her the $17,900 check, she learned from him that her account did not contain $15,000, presumably because her friend's check was not negotiable. Mrs. Hughes denied any suggestions that she had disclosed to respondent that her own check was not good at the time that she presented it to him.

Respondent's testimony was at odds with the OAE auditor's. According to respondent, Mrs. Hughes had first told him that the checks that would be exchanged for his trust account check were from a bankruptcy trustee and from the Hughes agency. When he gave Mrs. Hughes the $17,900 check, he did not examine the two checks. The following day, he discovered that, contrary to his belief, the $15,000 check was not a company check, but, instead, Mrs. Hughes' personal check. He then telephoned the bank and found out that her account had insufficient funds to cover his trust account check. He quickly contacted Mrs. Hughes, who assured him that the funds would be in the account immediately. Notwithstanding this promise, Mrs. Hughes did not give the funds to respondent forthwith and, in fact, never repaid the $15,000 in full, as seen below.

Respondent admitted that he did not stop payment on the check, although he had the opportunity to do so. He candidly testified that

I felt that I would start a chain reaction down the line that would probably be catastrophic, and I mean call me naive or bad judgment, but she told me she would give me the money. This woman had never done anything to make me think she was dishonest because I had dealt with her. I had believed her. Looking back, in hindsight, it was probably the worst thing I have ever done in my career, but I trusted her. That's what it came down to here.

The $17,900 check cleared respondent's trust account on November 27, 1985, thereby invading client funds. At the DEC hearing, respondent conceded that the $17,900 withdrawal caused him to be out of trust, although no checks were ever returned for insufficient funds. Respondent also admitted that he did not have enough legal fees in the trust account to cover the $15,000 deficiency.

Ultimately, Mrs. Hughes paid $12,500 to respondent, mostly by way of real estate commissions that she received. Respondent was unable to recall or produce a schedule of payments. He remembered only that the repayments were "in the two to three thousand-dollar range," and that the first took place within two months of November 10, 1985. In the summer or fall of 1989, after respondent retained counsel to represent him in the disciplinary proceedings, he

deposited $2,500 of his own funds into the trust account to make up for the shortage. [Footnote, exhibit, and transcript references omitted.]

The OAE, like the DEC, argues that the present case is controlled by *In re Brown*, 102 *N.J.* 512, 509 *A.*2d 176 (1986). In *Brown*, the respondent deposited a client's check for $20,000 and drew against that deposit without waiting for the check to clear. The check was dishonored, and the client, who subsequently went bankrupt, could not make good on the check. Thus, Brown suffered a $20,000 deficiency in his trust account. Instead of notifying the parties or restoring the funds, Brown embarked on a four-year practice of "lapping" his trust account by invading the funds of one client to pay another.

Two years after the original $20,000 deficiency, Brown's problems worsened. He was indebted to the Internal Revenue Service (IRS) for unpaid personal taxes. The IRS seized an $8,098 interest-bearing escrow account that Brown had opened on behalf of a client. The account, however, was not designated as a trust account and bore Brown's social security number. As with his trust account, Brown resorted to "lapping" to pay off his client. The result was that "his trust account was short more than $28,000, rather than the original $20,000." *Id.* at 515, 509 *A.*2d 176. Although the occasional deposit of legal fees in Brown's trust account "may have made a dent in the shortage from time to time, it did not come near returning the account to an in-trust condition during the four-year span." *Ibid.* Additionally, Brown invaded the trust account to pay his monthly rent and his secretary's salary. Based on those facts, we concluded that Brown had knowingly misappropriated trust funds as prohibited by *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979).

█ In concluding that the record did not establish by clear and convincing evidence that respondent had knowingly misappropriated clients' funds, the DRB distinguished the present case from *Brown*. The DRB concluded:

Here, respondent's actions also created a deficiency in his trust account when he issued a check against uncollected funds and, the next day, he discovered

that one of Mrs. Hughes' checks was not backed up by sufficient funds. But he did not do so knowingly. The evidence does not clearly and convincingly demonstrate that respondent knew, on November 25, 1985, the date he issued his $17,900 trust account check to Mrs. Hughes, that her $15,000 check was not good. Unquestionably, the use of his trust account to accommodate a friend's interests was improper, as was his issuance of a trust account check before the clearing of the equivalent funds designated to cover it. Nonetheless, respondent's conduct did not constitute knowing misappropriation of clients' funds.

Furthermore, respondent acted with dispatch upon discovering that one of the checks was not covered by sufficient funds. He quickly contacted Mrs. Hughes, who assured him that the monies would be given to him immediately. He had no reason to doubt her, given their long-standing friendship and business dealings. Mrs. Hughes' explanation that the elderly friend who had lent her the monies had forgotten to deposit her own monies in her account also appeared reasonable to him. Clearly, his actions in this regard did not resemble Brown's, who knew that his client would be unable to make good on the $20,000 check because he had filed for bankruptcy.

Moreover, both respondent and Mrs. Hughes testified that Mrs. Hughes had made periodic reimbursement payments to respondent to the extent of $12,500 beginning within two months of the issuance of the trust account check. Neither respondent nor Mrs. Hughes could recall when each installment payment was made and respondent's shabby records made it impossible for the OAE auditor to so verify.

Furthermore, it is unquestionable that respondent ultimately deposited personal monies into the trust account in 1989 when "it became apparent to [him] that [Mrs. Hughes] wasn't making any more payments," thus restoring the account to its in-trust position. [Transcript reference omitted.]

We likewise find that the record does not establish that respondent knowingly misused clients' funds. We also agree with the DRB that "respondent improperly utilized his trust account to accommodate a friend's interests, issued a trust account check against uncollected funds, and acted recklessly when he did not stop payment on the $17,900 check for reasons that, albeit altruistic, are wholly unjustifiable."

As the DRB observed, respondent erred in issuing "a trust account check before the clearing of the equivalent funds designated to cover it." The Advisory Committee on Professional Ethics (ACPE) has described the general rule. An attorney may not draw on trust funds "for ... purposes, such as the disbursement of the settlement proceeds of a negligence case, regardless of whether certified, cashier's or bank checks have been deposited but have not yet cleared...." Op. 454 (1980).

■ An exception exists for real estate or commercial closings involving the transfer of property "where it is either essentially or commercially desirable that trustee checks be issued against certified, bank or cashier's checks that have not cleared." The ACPE has since extended the exception to include savings and loan checks. *Notice to the Bar, "Amendment to Ethics Opinion 454,"* 114 *N.J.L.J.* 110 (Aug. 2, 1984). A realtor's personal check or, as respondent believed, "company check" does not satisfy those requirements. Nor does the transaction in which he received the check, which was not a closing, but merely the accommodation of a client.

■ Attorneys must not advance trust funds to accommodate clients. That the advance is drawn against the client's personal or business check makes no difference. The reason is that the attorney is gambling with his or her trust funds in the hope that the client's check will clear. Attorneys may draw against checks deposited in their trust accounts only in the limited circumstances of real estate or commercial closings in which the attorneys have received certified, bank, savings and loan, or cashiers' checks. In the future, attorneys who improperly draw against other checks deposited in their trust accounts will run the risk of a more severe penalty, including disbarment.

■ Like the DRB, we find, however, that other facts mitigate respondent's impropriety. Respondent's client testified that she had believed her checks were backed by sufficient funds. Based on their long-standing relationship, respondent trusted her. As soon as respondent discovered that the checks were not backed by sufficient funds, he called the client, who assured him that she would deposit sufficient funds to cover her checks. Shortly thereafter both the client and respondent made periodic reimbursement of the account. Finally, respondent, whose record is otherwise unblemished, has taken the necessary action to prevent a recurrence.

Although the facts do not compel disbarment, they require a period of suspension. In determining the period of suspension, we find guidance in *In re Librizzi*, 117 *N.J.* 481, 569 *A.*2d 257 (1990). Like respondent here, Librizzi was guilty of record-keeping violations. Librizzi also had been out-of-trust to the extent of $25,000 for approximately two years, and had failed to place in his trust account funds to cover a check that had been returned for insufficient funds. *Id.* at 486–87, 569 *A.*2d 257. Also like respondent, Librizzi had not been the subject of previous disciplinary proceedings, and none of his clients had been harmed. On these facts, we found that the attorney should be suspended for six months. We likewise find that a six-month suspension is appropriate in the present case.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

## ORDER

It is ORDERED that HUGO L. MORAS of SOUTH ORANGE, who was admitted to the bar of this State in 1975, is hereby suspended from the practice of law for a period of six months, effective March 22, 1993, and until the further Order of the Court; and it is further

ORDERED that respondent shall be restrained and enjoined from practicing law during the period of his suspension and that he shall comply with Administrative Guideline 23 of the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.

WITNESS, the Honorable Robert N. Wilentz, Chief Justice, at Trenton, this 26th day of February, 1993.

*For Suspension*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN GARIBALDI and STEIN—7.

*Opposed*—None.