IN THE MATTER OF DENNIS J. IULO, AN
ATTORNEY AT LAW.

Argued April 25, 1989—Decided July 7, 1989.

*Richard J. Engelhardt,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*John Vincent Saykanic* argued the cause on behalf of respondent (*Miles Feinstein,* attorney).

PER CURIAM

This disciplinary proceeding results from an audit of the trust funds of respondent, Dennis J. Iulo, by the Office of Attorney Ethics pursuant to *Rule* 1:21-6(c). In 1981, an attorney involved in a real estate closing with the respondent was aggrieved by the failure of respondent to pay off an outstanding mortgage on the involved property. When questioned about the failure to pay off the mortgage, respondent said that it had been an inadvertence. He mailed a $9,000 check to the mortgagee bank on May 29, 1981, but the other attorney soon learned that the check had bounced.

The matter was brought to the attention of the District XI Ethics Committee. Defendant had an accountant prepare a reconciliation of his trust account. This disclosed shortfalls in the trust account, which resulted in respondent's temporary suspension from the practice of law on December 17, 1982. 91 *N.J.* 618. This suspension was continued pursuant to a consent order. These discrepancies in respondent's account eventually led to an investigation by the Passaic County Prosecutor and resulted in the respondent's conviction by a jury of two counts of misapplication of entrusted property, in violation of *N.J.S.A.* 2C:21-15.

The case comes before us on an appeal from the decision and recommendation of the Disciplinary Review Board (DRB), which heard the matter on a motion for final discipline filed by the Office of Attorney Ethics, pursuant to *Rule* 1:20-6(c)(2). The basis for the disciplinary proceedings was respondent's 1987 criminal convictions for misapplication of entrusted funds in the attorney trust account. The DRB recommended disbarment in reliance on the rule of *In re Wilson*, 81 *N.J.* 451 (1979), that a knowing misappropriation of client's funds almost invariably warrants disbarment.

I

In disciplinary proceedings, a criminal conviction is conclusive evidence of respondent's guilt. *R.* 1:20-6(c)(1); *In re*

*Peia,* 111 *N.J.* 318, 320 (1988). Therefore no independent examination of underlying facts is necessary to determine guilt of the crime used as a basis for establishing a violation of our Rules of Professional Conduct. *In re Bricker,* 90 *N.J.* 6 (1982). Ordinarily "[t]he only issue to be determined is the quantum of discipline to be imposed." *In re Peia, supra,* 111 *N.J.* at 320; *R.* 1:20–6(c)(2)(ii).

The distressing aspect of this case is a gnawing uncertainty about the "underlying facts" that the jury verdict establishes. The jury verdict convicted the defendant of Counts One and Three of a multi-count indictment. Those two counts charged that the defendant "did apply and/or dispose of" clients' funds valued at approximately $40,548.97 and $30,802.59, which were to be held in trust for the clients on their behalf. Those two figures represented the balance shown on reconciliation statements prepared by the defendant's own accountant for the two dates, March 23, 1981 ($40,548.97), and June 9, 1981 ($30,-802.59).

In actuality, however, these were not two separate misapplications but the total running accounts of the respondent's trust account reconciled at two different dates two and one-half months apart. Obviously, the original deficiency of March 23, 1981, continued in substantial portion until June 9, 1981, and to some extent was reduced. The names shown on the reconciliation are the same.

But there is no smoking gun to be found in the proofs. There is no purchase of a Cadillac with client's funds. Rather, the case was made out solely by the accountant's report showing that on these two distinct dates respondent was out of trust in the amounts shown on the exhibits designated "Status of Trust Account." The only other evidence related to defendant's actions subsequent to the discovery of the shortage, including loans from a personal friend that went into the trust account when respondent was having "cash flow problems." When his accountant asked respondent about these loans, respondent

"stated that he knew that there was a shortage in the [trust] account of some sort.... and had put this money in to make the account whole." Other personal funds were also deposited in the trust account.

Nor is there "proof" of why or how these specific deficits arose. Were there uncollectible funds that would have put the accounts closer in balance? Were there even checks in the file that would have explained the discrepancies? Another accountant concluded:

> Inasmuch as Mr. Iulo has no clerical staff, or other paid professional help to use in maintaining financial records, the sheer number of cases and checks drawn created a situation where Mr. Iulo could not readily determine exact total balances or detailed client fund availability on a daily basis. Such lack of control created the circumstances wherein trust checks were issued against "insufficient/uncollected funds."

█ It is not a crime merely to be out of trust. Moreover, we have not disbarred attorneys whose trust accounts have disclosed shortages provided that we were satisfied that the evidence did not clearly and convincingly demonstrate that the shortages were the result of a knowing misuse of client's funds, even if there were lapping [1] of clients' funds as in this case. *In re James*, 112 *N.J.* 580 (1988); *In re Noonan*, 102 *N.J.* 157 (1986).

The critical question is whether there was a knowing misuse of clients' funds. Respondent asserts that he never received any personal benefit from the shortages in his trust account, but that is not the point. *See Noonan, supra*, 102 *N.J.* at 160. Even if he did not use the money for his own personal use, the judgment of conviction establishes a situation that "amounted to nothing less than the knowing invasion of the funds of one client to pay another client." *In re Brown*, 102 *N.J.* 512, 516 (1986).

The jury convicted the defendant of knowing misapplication of clients' funds. This fourth-degree offense is the least culpa-

---

[1]"Lapping" is the use of one client's designated trust funds to cover another client's needs. *See In re Brown*, 102 *N.J.* 512, 514 (1986).

ble of the offenses codified at *N.J.S.A.* 2C:21–1 to –19 relating to fraudulent practices. The specific offense, *N.J.S.A.* 2C:21–15, provides, in pertinent part, that

> [a] person commits a crime if he applies or disposes of property that has been entrusted to him as a fiduciary * * * in a manner *which he knows* is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted *whether or not the actor has derived a pecuniary benefit.* (Emphasis added.)

The Code commentary explains that "as a practical matter criminal sanctions less severe than those provided for theft will suffice to deter a person from wrongful dealing with property in a way that involves no gain for himself or other individuals in whom he might be interested." *II Commentary: Final Report of the New Jersey Criminal Law Revision Comm'n* 248–49 (1971). In this context, the Code equates public and private entrusted property for purposes of criminal liability.

The essential elements of this offense, that the defendant knowingly misused entrusted property, track in many ways our understanding of a *Wilson* violation. For as we pointed out in *In re Noonan, supra,*

> [t]he misappropriation that will trigger automatic disbarment under *In re Wilson,* 81 *N.J.* 451 (1979), disbarment that is "almost invariable," *id.* at 453, consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking. It makes no difference whether the money is used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he ultimately did reimburse the client; nor does it matter that the pressures on the lawyer to take the money were great or minimal. The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mind, is irrelevant: it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment. * * * The presence of "good character and fitness," the absence of "dishonesty, venality, or immorality"—are all irrelevant. While this Court indicated that disbarment for knowing misappropriation shall be "almost invariable," the fact is that since *Wilson,* it has been invariable. [102 *N.J.* at 159–60 (footnote omitted).]

■ We quote at such length from *Noonan* because the explication of *Wilson* fits so closely the situation before us. In *In re Brown, supra,* we confronted a situation of "lapping" of

clients' funds. There we concluded that "[e]ven assuming that respondent's difficulties originated with a scoundrel who sought to pass a bad check, there is no excusing Brown's constant dipping into his trust account for four and a half years thereafter." 102 *N.J.* at 517.

As noted, the period of time is much shorter here: defendant was showing a surplus in his account within a year and a half of the deficiency dates. Nevertheless, there was, in the opinion of the Appellate Division that sustained the criminal conviction, sufficient evidence of the knowing misuse of clients' funds to sustain a criminal conviction.

Regrettably, we must conclude that this was a case that had to be won in the courtroom. The moral quality of the conduct is not strikingly distinct from that in *In re James, supra,* 112 *N.J.* 580, or *In re Orlando,* 104 *N.J.* 344 (1986), but in each of those cases our disciplinary bodies found that there was not clear and convincing evidence of knowing misuse of clients' funds. Were we to conclude so here, we would be required to reject the jury verdict. That jury was required to find, beyond a reasonable doubt, that, in the words of the indictment, defendant "did apply and/or dispose of private property belonging to various former clients of his law practice, * * * which were to be held in trust for them or on their behalf, and which were entrusted to him as a fiduciary as the attorney for the said clients, in a manner which he knew to be unlawful * * *, contrary to the provisions of *N.J.S.A.* 2C:21-15." We are unable to reject the jury's verdict.

The result is, of course, deeply troubling. Respondent was respected, trusted, and admired in his community. He had given his time to work with a local cleric, helping the mentally retarded and senior citizens in his community. He argued before us and the jury that he had never withdrawn money from his trust account for any other purpose than the clients'. But we are unable to impeach the jury's verdict. If there be a flaw in the conviction, it must find correction in the criminal appeal process.

In view of our conclusion that the jury verdict established that respondent knowingly misappropriated client funds, we order that he be disbarred. Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For disbarment*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.

### ORDER

It is ORDERED that DENNIS J. IULO of CLIFTON, who was admitted to the bar of this State in 1972, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that DENNIS J. IULO be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.