632 A.2d 271

IN THE MATTER OF THE APPLICATION
OF ROGER PETERMAN.

Argued June 2, 1993—Decided November 5, 1993.

*John J. Janasie,* First Assistant Ethics Counsel, argued the cause on behalf of Committee on Character.

*Lewis P. Sengstacke* argued the cause for respondent.

PER CURIAM.

This matter arises from a Report of the Committee on Character that Roger Peterman be certified for admission to the bar of this state. One member of the committee panel that heard the matter dissented. That member believed that Peterman's admission to the bar was precluded by this Court's decision in *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979). As a young lawyer in Pennsylvania, Peterman had misappropriated the proceeds of all or part of three insurance checks intended as medical reimbursement payments for a physician who had treated, at Peterman's request, a client in a personal-injury case.

I

*In re Wilson* was decided on December 19, 1979. In that case the Court held that a knowing misappropriation of clients' funds will almost invariably warrant disbarment of the attorney. Some months before that decision, on August 9, 1979, the Keystone Insurance Company of Pennsylvania mailed a check to Mr. Peterman in the amount of $479.31, payable to Ernest McCain, Peter-

man's client in the personal injury case. McCain endorsed the check and went with Peterman to a bank where the check was cashed. Peterman either deposited these proceeds into an account over which he had signature authority or retained them as cash.

After the *Wilson* decision, on March 21, 1980, Keystone issued a second check in the amount of $149.64, again payable to McCain. McCain endorsed the check and Peterman deposited it in an account that he held jointly with his wife. Finally, on May 21, 1980, Keystone issued a third check in the amount of $996.97, jointly to Ernest McCain and Dr. Richard Kaplan, the physician who had treated McCain at Peterman's request. McCain endorsed the check. Peterman then signed Dr. Kaplan's name to it and deposited it in the joint account, retaining some cash.

In his testimony before the Committee on Character, Peterman described the harrowing circumstances under which his final wrong occurred. He said:

> Yes, I even remember that day. In this case, I specifically remember the day. It was a terrible day. I had—my car was no longer running and I received the check and I walked to my office, which is about—I didn't have money for the bus and I walked about two miles into Center City Philadelphia and had already called Mr. McCain and arranged to meet him there to obtain his endorsement. I remember that I was barely able to make it. Physically I was so drained and debilitated that I was—had a hard time getting there to the site where I met Mr. McCain.

He described his conversation with Mr. McCain about the status of the personal injury case and how, after that meeting, he went from the office and walked into an area of North Philadelphia frequented by drug users and drug dealers. He stopped at an automatic-teller machine where he deposited the check by signing Dr. Kaplan's name and putting the check into the machine, from which he was able to withdraw $200 in cash. He said that he could not "say exactly what I was thinking about. I was probably thinking that I was excruciatingly ill and I hate to be unnecessarily graphic." He described his feeling of disgust and his loss of control of his bowels, testifying that he

> just remember[ed] being so humiliated completely, completely destroyed emotionally. You know, looking back on it and I don't want to sound too absurd, but I

mean, looking back on it I'm convinced now that I believed at the time that I was authorized—that I believed in my demented thinking with my addictive process at work, that I believed that I was authorized to sign his name because I was going to pay him in any case, and that I had an account with him. I had an independent contractual obligation to pay him.

While the Disciplinary Review Board of the Supreme Court of Pennsylvania did not credit Peterman's testimony that he believed that he was authorized to sign Dr. Kaplan's name, the fact remains that Peterman had arranged for the medical treatment and had, according to his testimony, guaranteed the payment of Dr. Kaplan's bills.

Despite what he claims was his intention, he never made the payments to Dr. Kaplan, who complained to the Philadelphia Prosecutor's Office, which brought criminal proceedings against Peterman. A jury convicted Peterman of two misdemeanor counts of failure to make required disposition of funds received, but acquitted him of forgery. On July 13, 1984, the Pennsylvania Supreme Court suspended him from practice as a result of the criminal conviction. He was disbarred in Pennsylvania on September 23, 1985.

Peterman was reinstated to practice in Pennsylvania on August 21, 1991. He passed the February 1992 administrations of both the New Jersey and New York Bar Examinations. On June 23, 1992, he was admitted to the bar of the State of New York.

The New Jersey Supreme Court Committee on Character held hearings and subsequently issued a Report and Recommendation certifying Peterman's fitness to practice law. We entered an Order to Show Cause why he should be certified for admission to the bar of this state.

## II

The standards for evaluating the fitness of a bar applicant to practice law are well settled. This Court has consistently required applicants seeking bar admission to possess good moral character. *See, e.g., In re Jenkins,* 94 *N.J.* 458, 466–67, 467 *A.*2d

1084 (1983); *In re Matthews,* 94 *N.J.* 59, 75–78, 462 *A.*2d 165
(1983). Although we acknowledge that the concept of "good moral
character" is susceptible to different definitions, we have deter-
mined that the "fitness requirement * * * be formulated in terms
of the qualities of character attorneys must possess to fulfill their
obligations to individual clients and to the judicial process." *Jen-
kins, supra,* 94 *N.J.* at 467, 467 *A.*2d 1084 (citing *Matthews, supra,*
94 *N.J.* at 77, 462 *A.*2d 165). We emphasized in *Matthews* that "a
bar applicant must possess a certain set of traits—honesty and
truthfulness, trustworthiness and reliability, and a professional
commitment to the judicial process and the administration of
justice. These personal characteristics are required to ensure
that lawyers will serve both their clients and the administration of
justice honorably and responsibly." 94 *N.J.* at 77, 462 *A.*2d 165.

 Thus, an applicant's appreciation for the importance of
honesty and candor is an indispensable ingredient of a finding of
fitness to practice law in New Jersey. At the same time, we have
recognized that evidence of reform and rehabilitation is relevant to
determine an applicant's fitness to practice law. *Matthews, supra,*
94 *N.J.* 59, 462 *A.*2d 165, involved a finding of investment fraud
prior to application for admission to the bar, and *Jenkins, supra,*
94 *N.J.* 458, 467 *A.*2d 1084, involved non-disclosure of theft and
embezzlement charges. In each case, we recognized that behavior
subsequent to an applicant's disqualifying actions that clearly and
convincingly demonstrates rehabilitation may support a finding of
present fitness. We set forth in *Matthews* the evidence that may
be found to be probative of reform and rehabilitation. Application
of these principles to the unique facts of this case results in our
concurrence with the statewide panel's conclusion that respondent
has demonstrated present fitness to practice law.

Although Peterman's prior criminal history raises serious con-
cerns about his fitness to practice law, we conclude that the record
establishes that respondent's attitude and behavior subsequent to
those acts demonstrate personal reform and rehabilitation.

There is more than enough evidence in this case to sustain the panel's finding of rehabilitation. A regrettable victim of drug use since his college days, Peterman was involved in a severe car accident shortly after he entered Rutgers Law School, resulting in extensive burns and fractures and treatment with morphine and other pain-killing drugs. He remained dependent on drugs throughout law school and the early years of practice. After a brief stint in public employment, he established his own practice in 1978, at which time he handled Mr. McCain's case.

Like so many others who come before us, it was not until he hit bottom after the McCain case that Peterman began his uphill climb. He has since demonstrated recovery by attendance at Alcoholics Anonymous, Narcotics Anonymous, and Lawyers Concerned With Lawyers. He has successfully turned his life around with a new marriage and with steady employment in the public sector as a youth-services worker. He has long since made full restitution to Dr. Kaplan. He has, as well, been involved in school-board activities, and in 1992 was appointed to the Drug and Alcohol Abuse Committee of the New Jersey State Bar Association. A witness at the hearing before the committee panel described "a man who has really been worthless turn out to be a terrific individual." Another said that she would "have no reservations at all" about recommending Roger Peterman, despite knowing of his personal problems. Others described his reputation for truth and veracity as "excellent"; "a very, very honest man"; "one of the highest degrees of commitment to recovery"; "I would trust Roger with any important decision that I had to make in my life."

Experts in the fields of addiction are convinced of his rehabilitation: "He's done a reversal and his commitment to recovery is impressive"; "misappropriation of funds was not a part of Peterman's character but a product of his addiction."

Based upon these factors, the panel concluded that Peterman has made a remarkable recovery from his addiction; his marriage

is stable and supportive; he is active in the community; and he has demonstrated rehabilitation.

### III

What concerns us most, and obviously gave the most concern to the panel, is the relevance of our decision in *In re Wilson* to the admission process. We agree with the premise that one who as an attorney steals clients' funds in another jurisdiction forfeits the right to practice law in New Jersey whether the offense occurs while the attorney is a member of the New Jersey bar or before the attorney has become a member of this bar. There are some acts of misconduct that demonstrate an irredeemable absence of the character and integrity necessary to the practice of law in New Jersey. In so ruling, we do not seek to export the *Wilson* doctrine; rather, we seek only to import into our legal community that set of values that we deem essential to the practice of law. There is no unfairness in expecting attorneys, wherever they practice, to recognize the character blemish implicit in stealing client funds. Where we differ from other jurisdictions is in assessing the loss of public confidence that arises when such an offender is reinstated to practice.

This case does not fit precisely, however, within the *Wilson* mold and there are several features to the case that temper the inexorable application of that rule. Unlike the criminal conviction in *In re Iulo*, 115 *N.J.* 498, 559 *A.*2d 1349 (1989), Peterman's Pennsylvania criminal conviction did not conclusively establish that Peterman had knowingly misappropriated client funds because Dr. Kaplan, not Ernest McCain, was the complainant in those proceedings.

It is clear from the record that these funds were never intended to be distributed to the client, Ernest McCain. It was understood by all parties that the funds were intended for Dr. Kaplan. Peterman thus relies upon our decision in *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985), in which we declined to disbar an attorney found to have used escrow funds without the permission

of one of the parties having an interest in the funds. Two reasons were given for imposing a lesser discipline: (1) an absence of clear and convincing evidence that respondent invaded the escrow funds with knowledge that the use of the funds was improper, and (2) that this was the first occasion on which we had addressed the near identity of escrow funds and trust funds. *In re Hollendonner, supra,* 102 *N.J.* at 29, 504 *A.*2d 1174.

Although this case is not on all fours with *Hollendonner* (Hollendonner had his client's consent to use the funds), an application of *Wilson* to this case would presuppose that an attorney practicing in New Jersey in 1980, who had engaged in the same misconduct as Peterman, would have been subject to disbarment. In *In re Goldstein,* 116 *N.J.* 1, 560 *A.*2d 1166 (1989), we declined to disbar an attorney who had taken the interest on clients' funds because the issue of misappropriation of the interest earned on trust funds rather than the principal itself had never been addressed by the Court in the disciplinary context. As with *Hollendonner,* where the Court clarified the identical nature of escrow and trust funds, "the situation require[d] more direct notice to the bar of the impact of misappropriation of the interest earned on trust funds before severe penalties [were] imposed for this improper conduct." *Goldstein, supra,* 116 *N.J.* at 6, 560 *A.*2d 1166. In *In re Kernan,* 118 *N.J.* 361, 365, 571 *A.*2d 1282 (1990), an attorney "received the [misused] funds for the purpose of paying * * * outstanding medical bills." However, we found there an absence of an "independent, antecedent duty," *id.* at 367, 571 *A.*2d 1282, to satisfy the medical bills out of the proceeds. That distinction is not present here because the check for the proceeds was payable to both the client and doctor.

One of the abiding justifications for the *Wilson* rule is "the fact that the offense is clear and well understood, both by the lawyer and by the public, and universally regarded as irredeemable." *In re Konopka,* 126 *N.J.* 225, 233, 596 *A.*2d 733 (1991). Peterman's conduct, then, should be judged as would that of a New Jersey attorney in 1980. The point is not that we expect attorneys

outside of New Jersey to be familiar with our disciplinary rules, but rather that we expect attorneys outside of New Jersey to appreciate the universal failure of professional integrity involved in the *Wilson* offense. These facts fell one step short of a *Wilson* offense as it was understood in 1980. It is not as clear to us as it is to our dissenting member that a knowing misuse of non-client funds in 1980 would have invariably warranted disbarment. For example, in *In re Farr*, 115 *N.J.* 231, 557 *A.*2d 1373 (1989), the Court declined to disbar a public prosecutor who had misused public property.

## IV

Abuse of the trust in which clients' funds are held has always been regarded as particularly reprehensible. "[T]here are few more egregious acts of professional misconduct of which an attorney can be guilty than misappropriation of a client's funds held in trust." *In re Beckmann*, 79 *N.J.* 402, 404–05, 400 *A.*2d 792 (1979). We will deny admission to the bar of the State of New Jersey to an attorney from another jurisdiction who has knowingly misappropriated clients' funds even though that jurisdiction may regard that attorney as fully rehabilitated and the attorney may be admitted to practice in other jurisdictions as well. We regard entrusted funds as client funds.

Roger Peterman's appropriation of the proceeds of the Keystone checks took place in 1979 and early 1980. The *Wilson* case was decided on December 19, 1979. Even after that date, variations on the clear theft of client trust funds did not invariably result in disbarment. The sequential congruity of these events with our *Wilson* decision and the fact that the funds in question were not clearly client trust funds at the date thereof tempers the application of the *Wilson* rule.

The certification of fitness to practice issued by the Committee on Character is affirmed.

CLIFFORD, J., dissenting.

In January 1979 respondent, Roger Peterman, undertook to represent one Ernest McCain in connection with McCain's claims resulting from an automobile accident. McCain had two separate claims: one for personal injury protection (PIP) benefits against Keystone Insurance Company, and a separate claim against the third-party tortfeasor, whose liability carrier was United States Fidelity & Guaranty Insurance Company (USF & G). In connection with the latter claim respondent decided "to have [McCain] evaluated" by a physician. Before the Committee on Character he testified that he did so "because I was told that that's what you must do in order to build up the specials."

To that end he communicated with Dr. Richard Kaplan, previously unknown to respondent but recommended to him by a professional colleague. Kaplan refused to treat the client unless he received a guarantee of payment, whereupon respondent wrote and hand-delivered to the physician a letter in which respondent personally guaranteed "the payment of [Kaplan's] bill for evaluation and treatment" of McCain. Thus reassured, Dr. Kaplan treated respondent's client from January to September 1979 with "massage and hydra-therapy, heat and water treatment and massage," resulting in a total bill for services of $2816.52, of which Medicare paid $1100.60.

In payment of the balance of $1625.92 due Dr. Kaplan, Keystone Insurance Company, the PIP carrier, issued three drafts: one dated August 9, 1979, in the amount of $479.31, payable to Ernest McCain; a second draft dated March 21, 1980, in the amount of $149.64, payable to Ernest McCain; and a third draft dated May 21, 1980, in the amount of $996.97, payable to Ernest McCain and Richard Kaplan.

Keystone forwarded all three drafts to respondent, but respondent made no payment to Kaplan. Rather, he had the client sign the first draft, after which he either deposited it in his fiancee's checking account, on which he had been given signature authority, or "held on to it as cash"—he could not remember which. Re-

spondent said that he knew he had to pay the doctor, but acting on the advice of an attorney "who was telling me how to handle this case," he thought he should wait until he had received a report from the physician.

The second draft from Keystone, in the amount of $149.64, likewise bore only the client's name as payee. Respondent obtained McCain's signature on it, endorsed it also himself, and deposited it in his own checking account (by that time he and his fiancee had been married). He had no attorney business account or trust account, and in fact was entirely unaware of any professional responsibility to maintain such accounts. As with the proceeds from the first draft, respondent used the funds from the second draft "in the general course of [his] daily activities," which included "obtaining heroin * * · * on a daily basis."

Keystone's third draft, in the amount of $996.97, was made payable to respondent's client and the physician. Respondent secured McCain's signature on the draft and then forged Dr. Kaplan's name. Through an electronic deposit machine he deposited the draft to his and his wife's account and withdrew either $150 or $200 in cash (whatever the cash limit was—respondent could not recall) and immediately purchased drugs. The balance of the funds from that draft, according to Peterman, remained in the account and "were probably used by my wife for her purposes or for our joint purposes, probably would have [been] applied to our rent." None of the money went to Dr. Kaplan, who eventually had to obtain a judgment against respondent and even then was unsuccessful in collecting all of the funds due him. (Dr. Kaplan has since been paid in full.)

As the above recitation indicates, Keystone sent to respondent the second and third drafts three months and five months respectively after our decision in *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979).

The Disciplinary Board of the Pennsylvania Supreme Court found that "respondent committed the forgery [of Dr. Kaplan's signature on the third draft], in addition to co-mingling and

converting *client funds* owed to the client's physician * * *."
(Emphasis supplied.) The Board's report continues: "Respondent
wilfully misappropriated entrusted funds and used them for his
own purposes." Those purposes included the purchase of heroin
and alcohol. The Commonwealth of Pennsylvania convicted defen-
dant of misdemeanor theft charges, and respondent was disbarred
in that jurisdiction, which readmitted him to practice in 1991.

The concept of "wilful[ ] misappropriation of entrusted funds"
and "converting client funds," as found by the Pennsylvania
disciplinary authorities, is straightforward, unambiguous, not in-
fected by anything fancy. The conduct it describes is precisely
what the *Wilson* rule makes grounds for disbarment in New
Jersey. The unmistakable import of the Disciplinary Board's
report is that respondent stole the money that his client owed to
Dr. Kaplan, to whom respondent had promised to make payment
and on whose behalf he had received the funds. The arrangement
with the physician had been entered into as a necessary—but
hardly laudable—component of what respondent believed his rep-
resentation of the client required: the hiring of a doctor to "build
up the specials." Keystone's drafts came into respondent's hands
for the sole purpose of paying Dr. Kaplan, to whom respondent
had given a written guarantee of payment; and respondent's sole
legitimate function in respect of the third draft would have been to
have McCain endorse the draft bearing his and Dr. Kaplan's
names as payees and dispatch the draft to Kaplan. Respondent
had the draft in trust for that sole purpose. His "knowing
misuse" was not simply of "non-client funds," as the Court con-
cludes, *ante* at 209, 632 *A*.2d at 275, but rather, as the Disciplinary
Board in Pennsylvania found as a fact, of "client funds owed to the
client's physician."

As much as does the Court do I applaud and admire Peterman's
heroic rehabilitation. But New Jersey lawyers must be struck, as
I am, by the paradox of our admitting to practice a Pennsylvania
lawyer whose offense, had it been committed while he was a
member of this state's bar, would have resulted in his name being

stricken from the roll because of a flat-out, unvarnished violation of the *Wilson* rule.

I would reverse the Committee's certification.

Justice GARIBALDI joins in this dissent.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN and STEIN—5.

*For reversal*—Justices CLIFFORD and GARIBALDI—2.