675 A.2d 604

IN THE MATTER OF JOHN L. DOWNER,
JR., AN ATTORNEY AT LAW.

Argued February 14, 1996—Decided April 19, 1996.

## ORDER

The Disciplinary Review Board having filed a report with the Court on October 25, 1995, recommending that **JOHN L. DOWNER, JR., of SUMMIT,** who was admitted to the bar of this State in 1985, and who was thereafter temporarily suspended from the practice of law by Order of this Court dated September 7, 1994,

1

and who remains suspended at this time, be disbarred for his knowing misappropriation of escrow funds;

And respondent having been ordered to show cause why he should not be disbarred or otherwise disciplined;

And good cause appearing;

It is ORDERED that the findings of the Disciplinary Review Board are hereby adopted and respondent is disbarred, effective immediately, and that his name be stricken from the roll of attorneys of this State; and it is further

ORDERED that the Decision and Recommendation of the Disciplinary Review Board, together with this Order and the full record of the matter, be added as a permanent part of the file of said **JOHN L. DOWNER, JR.,** as an attorney at law of the State of New Jersey; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **JOHN L. DOWNER, JR.,** pursuant to *Rule* 1:21-6 be restrained from disbursement except on application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court, who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that **JOHN L. DOWNER, JR.,** comply with *Rule* 1:20-20 dealing with disbarred attorneys; and it is further

ORDERED that **JOHN L. DOWNER, JR.,** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

## APPENDIX

### Decision of the Disciplinary Review Board

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter was before the Board based on a recommendation for discipline filed by Special Master Lewis B. Cohn on behalf of the District VC Ethics Committee.

Respondent was admitted to the New Jersey bar in 1985. On March 17, 1992, he received a public reprimand for (1) issuing bad checks to a vendor of a typewriter and theft by deception; (2) exhibiting a pattern of neglect; (3) displaying gross negligence in two matters; (4) improperly withdrawing from representation in one matter; (5) misrepresenting to a court clerk his reasons for not appearing in court; (6) failing to cooperate with the ethics authorities; (7) failing to maintain a *bona fide* office; (8) failing to promptly deliver property to a third party; and (9) failing to comply with the recordkeeping rules. *In re Downer*, 127 *N.J.* 168, 603 *A*.2d 38 (1992). In imposing only a public reprimand, the Board and the Court considered, in mitigation, respondent's mild memory-deficiency problems—possibly due to head injuries— which problems were exacerbated by respondent's longterm drug and alcohol abuse.

On September 15, 1994, respondent was temporarily suspended from the practice of law for failure to pay the administrative costs and sanctions incurred in connection with the prosecution of the above matter. He remains suspended to date.

The facts are as follows:

A. *Count One—The Chicago Title Insurance Company Matter*

This matter arose from a formal ethics complaint charging respondent with two counts of knowing misappropriation and one count of gross neglect and lack of diligence.

At the relevant times, respondent maintained an office for the practice of law and a title agency business in East Orange, Essex County, New Jersey, operating under the name of Contemporary Title Agency.

On July 31, 1987, respondent signed an agency contract with Chicago Title Insurance Company ("Chicago Title"). Pursuant to

4

the contract, Chicago Title appointed respondent as an agent for the promotion and transaction of a title insurance business in Essex County. As agent, respondent had the following obligations, among others: to solicit business for Chicago Title; to conduct the necessary searches before closings of title; to issue title insurance commitments; to issue title insurance policies; to collect premiums according to a schedule of rates and remittances set forth on a rider to the contract; and to remit to Chicago Title forty percent of the premiums collected, as its compensation. Paragraph 3 of the contract provided as follows:

DUTIES OF AGENT. Agent shall:

\* \* \* \* \* \* \* \*

F. Keep safely in accounts separate from Agent's personal or operating accounts all funds received by Agent from any source in connection with transactions in which Principal's title insurance is involved and to disburse said funds only for the purposes of which they were entrusted \* \* \* \*

[Exhibit P1–1]

Paragraph 7 of the Schedule of Rates and Remittances stated the following:

7. Agent agrees that remittances will be paid at the time of reporting policies issued to the Principal. The payment of remittances, and the simultaneous reporting of policy copies issued during the preceding month, shall be mailed to the Principal's Headquarter Office *within 15 days of the issuance of the policy,* by the 15th day of each month \* \* \* \* (Original emphasis).

[Exhibit P1–1]

According to Joseph Santosuosso, Chicago Title's then manager for the North Jersey area, in practice, the reporting to Chicago Title of the number of policies issued by an agent would be accomplished by forwarding to Chicago Title a voucher attached to the top of the title policy form. After the agent would issue the title insurance policy, the agent would fill out the voucher and forward it to Chicago Title's office. Chicago Title would then bill the agent for its portion of the premiums collected. That was the sole mechanism for notifying Chicago Title of insurance policies issued. Copies of the vouchers were not sent to Chicago Title's area managers.

As noted earlier, respondent became an insurance title agent for Chicago Title on July 31, 1987. As was customary, Chicago Title gave respondent $5,000 or $6,000 in "seed" money to start the agency business. For reasons unexplained by the record, respondent did not immediately establish bank accounts to operate his title agency business. Six months later, on January 8, 1988, respondent opened two accounts at Midlantic National Bank, in Newark: account # 58440264 ("escrow account") and account # 58440256 ("agency account"). According to the agency contract, all premiums were to be deposited in the escrow account.

Between November 1987 and March 28, 1988, respondent collected title insurance premiums in twenty real estate transactions. In none of these transactions did respondent remit to Chicago Title its portion of the premiums, or $4,017.79. Exhibit P1–2A. Neither did respondent issue the corresponding title insurance policies. Chicago Title discovered respondent's wrongdoing only after it began receiving complaints from the banks involved, demanding the title insurance policies.

In June 1988, respondent's agency contract with Chicago Title was terminated as a result of his failure to fulfill his obligations.

Respondent admitted that he collected the premiums in the twenty real estate transactions at stake and that he did not send forty percent of the premiums to Chicago Title. Respondent also admitted that he had used Chicago Title's portion of the premiums for purposes other than those for which they were intended. Respondent denied, however, that he had knowingly misappropriated the funds.

Respondent asserted various defenses against the charges of knowing misappropriation. First, respondent claimed that he was never properly trained by Chicago Title on how to issue title insurance policies and that, even after several sessions of instructions by Chicago Title employees on the subject, he never felt "comfortable" in issuing title insurance policies.

As noted by the Special Master, however, respondent's defense is, "at the outset, ingenuous." It is undeniable that Chicago Title gave respondent assistance in learning operating procedures and in issuing policies. On at least two occasions, Carolyn Leakes, a production supervisor and title officer for Chicago Title, visited respondent's agency to explain operating procedures. Although Leakes acknowledged that she did not instruct respondent how to issue title policies, she showed him how to issue title binders before the closing of title stage and had numerous subsequent phone conversations with respondent about underwriting issues. Similarly, Roxanne Logan, a Chicago Title employee whose job was to issue title policies, visited respondent's office once or twice. On those occasions, Ms. Logan explained to respondent how to issue policies and suggested that, if he had any questions, he should contact her. Ms. Logan acknowledged that she had several subsequent phone conversations with respondent, but could not recall whether they related to the issuance of policies.

Larry Green, too, at the time an Assistant Vice–President and branch manager for Chicago Title, recalled having five to seven telephone conversations with respondent about how to issue policies and about other operational procedures. Mr. Green testified that respondent called him only once after Roxanne Logan visited respondent's office. At that time, he offered respondent his assistance, if ever needed. Mr. Green testified that respondent did not call him after that occasion.

More importantly, as pointed out by the Special Master, the issuance of title insurance policies was at the heart of the reason why Chicago Title had engaged respondent as an agent. Accordingly, if respondent felt incapable or "uncomfortable" in issuing title insurance policies, he should have sought further assistance in training from Chicago Title or discontinued the operation of a business in which he could not perform adequately. Respondent did neither.

The second defense asserted by respondent is that Chicago Title was "a necessary component" of every closing. Respondent claimed that Chicago Title had notice of the business generated by the agency because Chicago Title had to provide updated information on the various closings. This defense, too, must be rejected. Chicago Title could not have been aware that respondent had issued title insurance commitments and accepted premiums because respondent did not send the corresponding vouchers to Chicago Title. In addition, as Larry Green testified, Chicago Title did not provide agents with updated information on the closings. Furthermore, respondent admitted to G. Nicholas Hall, an investigative auditor with the OAE, that Chicago Title was unaware that he was not issuing title policies. T4/20/1994 187, Exhibit P1–4. Lastly, even if Chicago Title were aware of respondent's activities, there is no explanation or excuse for respondent's failure to remit the forty percent portion of the premiums collected.

Respondent's third defense is that he had a verbal agreement with Joseph Santosuosso to delay the remittance of Chicago Title's share of the premiums because he was starting up the agency business and needed the cash at the time. Santosuosso, however, testified that he had no recollection of such agreement and that he never gave respondent permission to use the premiums for his own purposes.

To date, respondent has not made restitution to Chicago Title. Respondent alluded to "an agreement in place" to that end.

### B. *Count Two—The Kohl Closing*

On March 28, 1988, respondent represented Barbra Kohl, the grievant in this matter, in the purchase of a house from G. Hewitt Meade. Respondent became involved in this transaction on the eve of the closing of title. Until that time, the parties had been jointly represented by Robert Pickett, Esq. It was Mr. Pickett's belief that Ms. Kohl and Mr. Meade were married. When he found out near the closing of title that they were not, he declined to represent both parties and asked respondent to represent Ms.

Kohl. Respondent agreed. Mr. Pickett had been dealing with respondent's agency in procuring title insurance for the property.

This was respondent's first real estate closing. The day after the settlement, March 29, 1988, respondent deposited its proceeds of $220,162.50 in the agency's escrow account. Prior to this deposit, the balance in the account was $3.96. Respondent made no other deposits into the account before the *Kohl* funds were disbursed. Out of closing proceeds, respondent was entitled to a payment of $1,802.00: $350 for his legal fee, $150 for delivery charges, $200 for "fax" charges, and $1,102 for the title insurance premium as agent for Chicago Title. Nevertheless, between March 28, 1988 and June 17, 1988, respondent wrote a series of checks against the *Kohl* funds for purposes unrelated to the closing. Among the checks drawn during this time period were the following:

| CHECK NO. | PAYEE | AMOUNT |
|---|---|---|
| 1029 | Diana Lopez | $250 |
| 1031 | Eugene Victor | $100 |
| 1023 | Ben Henderson | $300 |
| 1026 | Ben Henderson | $300 |
| 1032 | Ben Henderson | $300 |
| 1025 | Carmen Del Valle | $200 |
| 1028 | Carmen Del Valle | $600 |
| | TOTAL | $2,050 |

Eugene Victor and Diana Lopez were respondent's former clients; Carmen Del Valle was his secretary and Ben Henderson was the landlord of his office building. OAE Investigator Hall testified that respondent had admitted to him that he had issued those checks to his landlord because he had been locked out of his office for non-payment of rent in April 1988.

Respondent did not deny issuing those checks for personal purposes. He claimed, however, that, because of his deficient

bookkeeping practices, he was unaware of the balance in the escrow account. The following exchange took place at the DEC hearing between the presenter and respondent:

Q. * * * now my question to you is on what basis could you have maintained an honest belief that you had any of your monies in that account after depositing the Kohl/Meade funds and prior to June 30, 1988?

A. More times than not I would write a check without checking the balance or without being aware of what was in the account, which is primarily the reason why so many checks bounced. I did not write checks with regard to an amount and being aware of a particular amount there was in the account.

On any of the accounts there are checks that bounced on all of these accounts there were checks that were paid on all of these accounts and there wasn't any conscious decision, well, I've got money in this account or I know I have X amount of dollars in this account. I will write the check on this account. Checks were written on accounts where there was no money as well as accounts that were—was written with money.

And with money that was not that they should not have been written on [sic].

[T4/21/1994 53–54]

\* \* \* \* \* \* \* \*

Q. And are you saying that you believe that you had your—some of your own funds—isn't it true that with regard to all three of your Contemporary Title accounts too, at Midlantic and the one at First Federal that from April 29th, until September 1988, you know, you held no other monies in any account, except the Kohl funds?

A. Mr. McGill, I can't answer you affirmatively with that and in—a—in no account was a—I aware [sic] of any type of regular basis or any type of consistent basis what was in one of the accounts and what was not in one of the accounts * * * *

[T4/21/1994 76–78]

In essence, respondent alleged that the misappropriation of the funds was the result of his careless recordkeeping and inattention to the requirements for the maintenance of trust and escrow accounts. This argument, however, must fail. As early as September 1987, when respondent's attorney records were audited by an accountant retained by the OAE, respondent had been made aware of his recordkeeping obligations. Moreover, the evidence gives rise to an inference that respondent knew precisely how much he had in his accounts, which showed very little activity. For instance, respondent maintained a trust account with First

Fidelity Bank. On March 14, 1988, respondent withdrew the entire balance of the account, $168.45, to the penny. Respondent admitted that, at the time of the withdrawal, he knew the exact balance. Thereafter, respondent issued a series of checks against his First Fidelity account, which were drawn against insufficient funds. Specifically, as early as two days after the withdrawal of the entire balance of the account ($168.45), respondent issued a check for $250.70. On April 26, 1988, however, he deposited $95 to the account in order to bring the negative balance to a zero amount. Throughout the next several months, respondent again maintained a negative balance in the account. In August 1988, however, he deposited $141.14, again, to restore the zero dollar balance in the account. The logical conclusion is that respondent obviously knew the exact balance in the account in order to make corresponding deposits to bring the account to a zero balance.

Another example is what occurred with the agency escrow account, which was opened in January 1988. As of February 18, 1988, the account balance was $13.98. On February 24, 1988, respondent deposited $500 in the account, bringing the account balance to $513.98. The source of the $500 deposit was the withdrawal of equivalent funds from the other account maintained by respondent in connection with the agency business, the agency account. Exhibit P2–10. On March 16, 1988, however, respondent withdrew the $500 from the escrow account and returned it to the agency account, which until then had a negative balance of $1.72. Exhibit P2–11.

The foregoing account transactions leave no doubt that, contrary to respondent's assertions, he had a precise knowledge of the balances of the two Midlantic accounts. Respondent might not have reconciled the records in connection with his accounts, but there can be no other conclusion than that he knew exactly what his account balances were at various times.

C. *Count Three—Gross Negligence and Lack of Diligence in the Kohl Transaction*

As a result of respondent's failure to make certain payments following the *Kohl* closing, Chicago Title had to pay claims totalling $3,773.12. Those were:

1. $1,360.98 to First Performance Mortgage Company, Kohl's mortgagee, for interest, document preparation fee, mortgage insurance and hazard insurance;

2. $1,328 for realty transfer tax and recording fees;

3. $1,084.14 to Trico Mortgage Company, because of respondent's failure to timely pay off the existing mortgage on the property.

In addition, respondent failed to record the mortgage and the deed.

D. *Failure to Cooperate with Disciplinary Authorities*

At the pre-trial conference, respondent agreed to supply a verified, more responsive answer to the complaint by no later than August 20, 1993; to provide reciprocal discovery to the OAE; and to submit a witness list by no later than September 10, 1993. Respondent did none of the above. On October 4, 1993, the newly appointed Special Master extended the deadlines. Again, respondent submitted nothing. Accordingly, the OAE amended the complaint to allege a violation of *RPC* 8.1(b) (failure to cooperate with ethics authorities). On December 10, 1993, the Special Master wrote to respondent requesting a verified answer, discovery and a list of witnesses by January 10, 1994. The hearing had been scheduled for January 19, 1994. Once again, respondent did nothing. On January 17 and January 18, 1994, respondent contacted the Special Master to request an adjournment of the hearing because of a surgical procedure. The Special Master adjourned the hearing. New hearing dates were scheduled for April 20 and April 21, 1994. Although respondent attended the

hearings, he did not file a more responsive answer, did not provide discovery to the OAE and did not supply a list of witnesses.

\* \* \*

Rejecting each of respondent's defenses as without substance, the Special Master filed a thorough, well-crafted report finding that respondent's alleged justifications for his actions were "at best ingenuous; at worst, still violative of the Rules of Professional Conduct and the New Jersey Rules of Court concerning trust accounts; and, in any case, contradicted by the facts presented at the hearings conducted in this matter." The Special Master concluded that respondent's "explanation of the manner in which he conducted [his financial] affairs is contradicted by the financial paper trail which he left as he attempted to cope with his financial affairs. In other words, this is not a situation of absolute ignorance as claimed by Downer, but, rather, a case of selective ignorance on his part." The Special Master went on to say that "[m]ore than merely not knowing all that was occurring in [his] accounts, Downer affirmatively disabled himself from knowing."

The Special Master concluded that respondent knowingly misappropriated both the *Chicago Title* and the *Kohl* funds and, in addition, grossly neglected the *Kohl* transaction. The Special Master dismissed the charge of failure to cooperate with the disciplinary authorities, reasoning that, although respondent's original answer might have been unartfully drafted, it nevertheless provided sufficient notice to the OAE of the defenses and substantive posture that respondent would adopt at the time of the hearing. The Special Master found that the lack of specificity in respondent's original answer in no way prejudiced the presentation of the OAE's case.

The Special Master recommended the imposition of public discipline.

\* \* \*

Following a *de novo* review of the record, the Board is satisfied that the Special Master's conclusion that respondent's conduct was

unethical is fully supported by clear and convincing evidence. For the reasons expressed above, the Board was persuaded that respondent knowingly misappropriated escrow funds by using for his personal purposes $4,017.79 in title insurance premiums collected in twenty real estate transactions and that he also knowingly misappropriated the *Kohl* funds. The Board rejected respondent's claims that his actions in the *Chicago Title* matter were the result of his poor training by Chicago Title and that his conduct in the *Kohl* matter was the product of grossly deficient recordkeeping. Those claims are clearly contradicted by the record. Chicago Title officials testified as to respondent's training and their offers of assistance, of which respondent did not avail himself. As to the *Kohl* matter, respondent had to know—even if he did not maintain his attorney records—that his account did not have sufficient funds to back up the $2,050 withdrawals; on several occasions, respondent deposited in his account exact amounts needed to bring its negative balance to a zero balance. At a minimum, as pointed out by the Special Master, respondent exhibited a willful blindness toward his recordkeeping obligations, sufficient to satisfy the requirement of knowledge. *In re Skevin*, 104 *N.J.* 476, 517 *A.*2d 852 (1986).

The proofs also convinced the Board that respondent grossly neglected the *Kohl* matter, thereby causing Chicago Title to incur unnecessary expenses. Lastly, unlike the Special Master, the Board found that respondent wilfully failed to cooperate with the disciplinary system, in violation of *RPC* 8.1(b).

A seven-member majority of the Board recommends that respondent be disbarred under *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985) (*Chicago Title* matter) and *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979) (*Kohl* matter). Two members would have imposed a two-year suspension on the basis that the medical evidence introduced in the disciplinary matter that led to respondent's reprimand suggested some degree of mental impairment on his part.

The Board further recommends that respondent reimburse the Disciplinary Oversight Committee for administrative costs.

O'HERN, J., dissenting.

I joined the dissenting opinion in *In re Bell,* 126 *N.J.* 261, 596 *A.*2d 752 (1991) that suggested:

[A]lthough the *Wilson* rule [of almost invariable disbarment] is the right rule for the vast majority of misappropriation cases, the inflexibility with which it can be applied runs the risk of creating within our attorney-discipline system an almost reflexive approach to such cases, obscuring and ignoring the individual circumstances to an intolerable degree.

[*Id.* at 267, 596 *A.*2d 752 (Stein, J., concurring in part and dissenting in part) (quoting *In re Konopka,* 126 *N.J.* 225, 241, 596 *A.*2d 733 (1991) (Stein, J., concurring).]

In Bell's case, albeit confronted with more profound personal suffering, we expressed the dissenting view that there may be some cases in which personal circumstances will warrant relief from the almost invariable rule of disbarment under *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979).

Our human experience is sufficient to infer a relationship between severe personal stress and acts of imprudence or even desperation. The question should not be one of causation, but rather whether our disciplinary system is sufficiently flexible in unique circumstances to temper the imposition of discipline by taking into account the influence of extraordinary events. It should be in this case.

[*Bell, supra,* 126 *N.J.* at 269, 596 *A.*2d 752 (Stein, J., concurring in part and dissenting in part).]

I think in this case, as I did in *Bell,* that respondent should be suspended indefinitely from the practice of law with leave to apply for reinstatement at such time as he is able to demonstrate his fitness to resume practice.

A majority of the Disciplinary Review Board (DRB) recommended that respondent be disbarred under *In re Hollendonner,* 102 *N.J.* 21, 504 *A.*2d 1174 (1985) (for his failure to remit title insurance premiums), and *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979) (for his misuse of client funds from a real estate closing matter). Two members would have imposed a two-year suspension on the basis that medical evidence introduced in the disciplin-

ary matter suggested some degree of mental impairment on his part.

To his credit, before us respondent did not challenge the factual findings made below. Rather, he urged that we consider the regrettable effects that long-term substance abuse had had upon his memory and ability fully to appreciate the nature and quality of his actions. His derelictions in the Chicago Title Insurance Company matter arose, not from his misconduct as an attorney for others, but from his role as an agent of the Chicago Title Insurance Company, a relationship that might have been viewed, had he not been an attorney, as a debtor-creditor relationship. The second matter, in the words of the DRB, "was respondent's first real estate closing." Respondent became involved in this transaction on the eve of the closing of title at the request of another attorney who had to withdraw from a possible conflicting representation. In respondent's haste, he actually brought the wrong checkbook to the closing.

The presenter for the Office of Attorney Ethics was candid to recognize the lack of venality in respondent's conduct.

> This Respondent is not a thief in the sense that he sits down and plots out a course of action to systematically steal money.
>
> His misconduct was not the product of a thieving ... design or scheme, but a scheme in the sense of willful blindness ... [.] I don't doubt that Respondent would have intended all along to pay Chicago Title their money at some point when he felt that he could afford to do it.
>
> I don't doubt that at whatever point he would have found out exactly how much of the Kohl/Meade [closing] fund[ ] monies he was using he would have replaced those.
>
> But I submit that Respondent knew he needed money ... and he went to where money was available to him.
>
> I submit that it is probably true that he didn't know that exact amount of money he was invading on the Kohl/Meade side of the transaction, but he must have known he was dipping into their money because he knew he didn't have any money of his own.

This young inner-city attorney, lacking the support staff and peer counselling that can be found in larger offices, "lost his ethical compass" just as did the young prosecutor whom we returned to practice despite his removal of drugs from an evidence

locker. *In re Farr,* 115 *N.J.* 231, 237, 557 *A.2d* 1373 (1989). John Downer does not strike me as a person with "an irredeemable absence of the character and integrity necessary to the practice of law in New Jersey." *In re Peterman,* 134 *N.J.* 201, 207, 632 *A.2d* 271 (1993). With proper guidance he could represent the public, including a portion that is largely underrepresented.

*For disbarment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, GARIBALDI, STEIN and COLEMAN—6.

*For suspension*—Justice O'HERN—1.